#23954-a-RWS

**2007 SD 33**

IN THE SUPREME COURT
OF THE
STATE OF SOUTH DAKOTA

* * * *

PAUL A. WOJEWSKI, M.D.,                    Plaintiff and Appellant,

   v.

RAPID CITY REGIONAL HOSPITAL, INC.,
CHARLES HART, M.D., and ROBERT
GLENN ALLEN, JR., M.D.,                    Defendants and Appellees.

* * * *

APPEAL FROM THE CIRCUIT COURT OF
THE SEVENTH JUDICIAL CIRCUIT
PENNINGTON COUNTY, SOUTH DAKOTA
* * * *

HONORABLE JANINE M. KERN
Judge

* * * *

MICHAEL P. REYNOLDS of
Barker Reynolds Law Firm LLC
Rapid City, South Dakota
and
KENNETH E. BARKER of
Barker Reynolds Law Firm LLC
Belle Fourche, South Dakota          Attorneys for appellant,
                                     Sara Wojewski Special
                                     Administrator for Estate.


DANIEL G. WILCZEK
DANIEL M. LOVEJOY of
Faegre & Benson LLP
Minneapolis, Minnesota
and
MARVIN D. TRUHE
Rapid City, South Dakota             Attorneys for appellees.

* * * *

ARGUED JANUARY 9, 2007

OPINION FILED **03/28/07**

#23954

SABERS, Justice

[¶1.] After Rapid City Regional Hospital (RCRH) removed Dr. Paul

Wojewski's (Wojewski) clinical privileges, Wojewski[1] sued on a variety of theories.[2]

The circuit court granted RCRH's[3] motions to dismiss on one claim and its motion

for summary judgment on the rest of the claims. Wojewski appealed. We affirm.

## FACTS

[¶2.] Wojewski was a cardiothoracic surgeon who joined the medical staff of

RCRH in 1988. In the summer of 1996, Wojewski started to exhibit unusual

behavior. He suffered a manic episode in July of 1996, where he was arrested and

---

1. Wojewski died in an automobile-pedestrian accident several months after initiating the suit. On November 8, 2005, his estate was substituted as a party.

2. Wojewski sued in federal district court seeking relief under Title I of the Americans with Disabilities Act (ADA), Title III of the ADA, the Rehabilitation Act, and six state law claims. Wojewski v. Rapid City Reg'l Hosp., 394 FSupp2d 1134 (DSD June 13, 2005). The district court granted summary judgment in favor of the defendants on the Title I and Rehabilitation Act claims because Wojewski was not an employee of the hospital. Id. at 1140. The Title III claim was dismissed since Wojewski was not a "client or customer" of the hospital. Id. at 1145. The district court declined to exercise jurisdiction over the state law claims. Id. The Court of Appeals for the Eighth Circuit affirmed the dismissal of the Title I and Rehabilitation Act claims. Wojewski v. Rapid City Reg'l Hosp., 450 F3d 338, 340 (8thCir 2006). It also ordered the Title III claim dismissed as moot since Wojewski had died while the appeal was pending. Id. at 342. He then brought the state law actions in state circuit court. Wojewski v. Rapid City Reg'l Hosp., No 05-650 (Pennington County Nov 15, 2005). That action is the subject of this appeal.

3. The Defendants are Rapid City Regional Hospital., Dr. Charles Hart, and Dr. Robert Glenn Allen, Jr. They will be referred to collectively as RCRH, unless further identification is necessary.

underwent inpatient psychiatric treatment. Two months later, he suffered another manic episode.

[¶3.] He was diagnosed with bipolar disorder, and in September of 1996, took a leave of absence from RCRH. That same month he requested reinstatement to the RCRH medical staff. RCRH reinstated Wojewski, with conditions, after reviewing four psychiatric reports. Wojewski met all the conditions of his reinstatement and all conditions were removed in January 1999.

[¶4.] In June 2003, Wojewski had another manic episode. According to RCRH, Wojewski did not inform it of his manic episode. Instead, he took a voluntary leave of absence in July 2003, after informing the hospital of "his difficulties."

[¶5.] Wojewski returned to RCRH on August 12, 2003. His privileges were subject to conditions, including a requirement that he inform RCRH of any changes in his mental health. Dr. James Oury was appointed to monitor Wojewski.

[¶6.] When Wojewski returned to RCRH, several individuals noticed he was acting strangely. As a result, a meeting was held the morning of August 19, 2003 to determine if Wojewski should be suspended or be allowed to continue with his surgery privileges. Wojewski had a surgery scheduled for that morning. The individuals involved in the meeting were Dr. Oury, Dr. Charles Hart, Dr. Robert Glenn Allen, Jr. and Dr. Dennis Nesbit. Prior to the meeting Wojewski's psychiatrist, Dr. Steven Manlove, told Dr. Hart that Wojewski was not manic. Dr. Oury told the group he thought Wojewski could perform the scheduled surgery,

based on his observations.[4] The group concluded that Wojewski could perform the scheduled surgery and did not suspend him.

[¶7.]     Unfortunately, Wojewski suffered a manic episode during the surgery. He refused to continue working on the patient and refused to allow anyone to help the patient. Wojewski was escorted from the operating room by security and Dr. Oury completed the surgery. Wojewski's hospital privileges were subsequently suspended.

[¶8.]     Wojewski requested a hearing and a Fair Hearing Panel was assembled. The Panel conducted a four-day hearing, where Wojewski was represented by counsel. At the conclusion of the hearing, the Panel determined Wojewski's privileges should not be reinstated because of the threat of unpredictable future relapses due to his bipolar disease. The Panel's decision was reviewed and upheld by an Appellate Review Committee and RCRH's Board of Trustees.

[¶9.]     Wojewski sued RCRH, Dr. Hart and Dr. Allen Jr. alleging six different counts: breach of contract, tortious interference with prospective business advantage, breach of fiduciary duty, aiding and abetting a breach of fiduciary duty, negligent infliction of emotional distress and intentional infliction of emotional distress. RCRH filed a motion to dismiss or, in the alternative, for summary judgment. The circuit court granted RCRH's motion to dismiss on the basis of

---

4.     Dr. Oury saw Wojewski perform surgery the previous day and observed him that morning. Dr. Hart met with Wojewski after the meeting, but prior to the surgery, and thought he was rational.

immunity. It also granted, as an alternative ground, the summary judgment motion on the state tort claims.

[¶10.]     Wojewski appeals and raises the following issues:

1.     Whether the Health Care Quality Improvement Act affords immunity to defendants for allowing Wojewski to perform surgery on August 19, 2003.

2.     Whether the Impaired Physician Policy Statement is a contract.

3.     Whether a tortious interference with prospective business advantage claim can stand when a party fails to act, rather than affirmatively acts.

4.     Whether a fiduciary duty is created when a party purposely exercises complete control over a person's body and actions.

5.     Whether the court erred in granting summary judgment on the negligent infliction of emotional distress claim.

6.     Whether the court erred in granting summary judgment on the intentional infliction of emotional distress claim.

## STANDARD OF REVIEW

[¶11.]     "It is well settled that '[a] motion to dismiss under Rule 12(b)(5) tests the law of a plaintiff's claim, not the facts which support it.'" Osloond v. Farrier, 2003 SD 28, ¶4, 659 NW2d 20, 22 (quoting Thompson v. Summers, 1997 SD 103, ¶5, 567 NW2d 387, 390 (additional citations omitted)). The circuit court,

> consider[s] the complaint's allegations and any exhibits which are attached. The court accepts the pleader's description of what happened along with any conclusions reasonably drawn therefrom. . . . 'In appraising the sufficiency of the complaint we follow, of course, the accepted rule that a complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief.' The question is whether in the light most favorable to the plaintiff, and with doubt resolved in his or her behalf, the complaint

-4-

states any valid claim of relief. The court must go beyond the allegations for relief and 'examine the complaint to determine if the allegations provide for relief on any possible theory.'

*Id.* (internal citations omitted). "An appeal of a motion to dismiss presents a question of law and our standard of 'review is de novo, with no deference given to the trial court's legal conclusions.'" *Id.* (quoting City of Colton v. Schwebach, 1997 SD 4, ¶8, 557 NW2d 769, 771).

[¶12.] Our review of a summary judgment is well settled.

In reviewing a grant or a denial of summary judgment under SDCL 15-6-56(c), we must determine whether the moving party demonstrated the absence of any genuine issue of material fact and showed entitlement to judgment on the merits as a matter of law. The evidence must be viewed most favorably to the nonmoving party and reasonable doubts should be resolved against the moving party. The nonmoving party, however, must present specific facts showing that a genuine, material issue for trial exists. Our task on appeal is to determine only whether a genuine issue of material fact exists and whether the law was correctly applied. If there exists any basis which supports the ruling of the trial court, affirmance of a summary judgment is proper.

Read v. McKennan Hosp., 2000 SD 66, ¶8, 610 NW2d 782, 784 (quoting Coffee Cup Fuel Stops & Convenience Stores, Inc., v. Donnelly, 1999 SD 46, ¶17, 592 NW2d 924, 926) (additional citations omitted).

[¶13.] **Whether the HCQIA affords immunity to RCRH for its August 19, 2003 meeting and its decision to allow Wojewski to perform surgery that day.**

[¶14.] The Health Care Quality Improvement Act (HCQIA), 42 USC section 11101 *et seq,* was passed "'to improve the quality of medical care by encouraging physicians to identify and discipline physicians who are incompetent or who engage

in unprofessional behavior.'" Sugarbaker v. SSM Health Care, 190 F3d 905, 911 (8thCir 1999) (quoting Mathews v. Lancaster Gen. Hosp., 87 F3d 624, 632 (3dCir 1996) (quoting HRRep No 903, 99th Cong, 2d Sess 2 (1986))). Congress gave immunity to participants engaged in professional peer review actions in order to advance effective peer review. *Id.* (citing 42 USC §§ 11101(5), 11111(a)).

[¶15.] For immunity to apply, the action must come within the statutory meaning of "professional review action." *Read*, 2000 SD 66, ¶18, 610 NW2d at 785 (quoting 42 USC § 11151(9)). "Professional review action" is defined as,

> an action or recommendation of a professional review body which is taken or made in the conduct of professional review activity, which is based on the competence or professional conduct of an individual physician (which conduct affects or could affect adversely the health or welfare of a patient or patients), and which affects (or may affect) adversely the clinical privileges, or membership in a professional society, of the physician. Such term includes a formal decision of a professional review body not to take an action or make a recommendation described in the previous sentence and also *includes professional review activities relating to a professional review action.*

42 USCA § 11151(9) (emphasis supplied). "Professional review activity" is also covered by immunity and is defined as,

> an activity of a *health care entity* with respect to an individual physician – (A) to determine *whether the physician may have clinical privileges* with respect to, or membership in, the entity, (B) to determine the *scope or conditions of such privileges* or membership, or (C) to *change or modify* such privileges or membership.

42 USCA § 11151(10) (emphasis supplied).

[¶16.] Wojewski concedes the actions taken by RCRH *after* the August 19 surgery incident are immune from damages under the HCQIA. His sole contention

is the August 19 morning meeting to discuss revoking Wojewski's privileges and the subsequent decision to allow him to continue with surgery are 1) not peer review actions, or 2) the group was not a "professional review body" under HCQIA and the actions are not immune. Wojewski claims his six state law causes of action arise from this August 19 meeting and decision and should be actionable because they do not fall within HCQIA's grant of immunity.

[¶17.] RCRH claims the August 19 morning meeting is "professional review activity" within the meaning of HCQIA and entitled to immunity. *See* 42 USCA § 11151(10); Singh v. Blue Cross/Blue Shield of Mass., Inc., 308 F3d 25, 36-37 n11 (1stCir 2002). If its contention is correct, RCRH would be immune from the alleged damages of the state law causes of action and the circuit court's grant of RCRH's motion to dismiss would be proper. *See* 42 USCA § 11111(a)(1) ("If a professional review action . . . of a professional review body meets all the standards specified in section 11112(a) of this title . . . [*any person participating*][5] *shall not be liable in damages under any law of the United States or of any State* . . . with respect to the action.") (Emphasis supplied).

[¶18.] While the HCQIA was enacted in 1986, this is only the second time we have considered whether a hospital's action falls within its immunity provisions. *See Read*, 2000 SD 66, ¶18, 610 NW2d at 785. Whether the actions in this case are

---

5. The statute grants immunity to the following individuals: "(A) the professional review body, (B) any person acting as a member or staff to the body, (C) any person under a contract or other formal agreement with the body, and (D) *any person who participates with or assists the body with respect to the action* . . . ." 42 USCA § 11111(a)(1)(A)-(D).

"professional review activity" is a matter of first impression. *See id.* ¶19 (finding no immunity because the decision to nonrenew the radiology privileges was based on an exclusive service contract and not on "the competence or professional conduct of a physician," as required by the HCQIA).

[¶19.]      In *Mathews v. Lancaster General Hospital*, the court found the term "professional review activity" to mean "preliminary investigative measures taken in 'a reasonable effort to obtain the facts' relevant to a possible change in a physician's privileges . . . ." 87 F3d at 634 (quoting Mathews v. Lancaster Gen. Hosp., 883 F Supp 1016, 1027 (DPa 1995)). The court found a "professional review action" was "the decision that results from a review of the facts obtained." *Id.* The professional review activities are a subpart of and precursor to the professional review action. *Id.* ("The definition of 'professional review action' encompasses decisions or recommendations by peer review bodies that . . . impose some lesser sanction that may eventually affect a physician's privileges.").

[¶20.]      RCRH urges this Court to hold the meeting on the morning of August 19 was a professional review activity. Wojewski argues the meeting was simply to determine if that one surgery could continue and was not a determination of his surgical privileges. However, deciding if a doctor may perform surgery at their hospital is a determination of whether the physician's privileges should be modified. This meeting was clearly an activity that determined "whether the physician may have clinical privileges, [or] to determine the scope or conditions of such privileges . . . or to change or modify such privileges. . . ." *See* 42 USCA § 11151(10). Therefore, the morning meeting meets the statutory definition of "professional review activity."

*See id.* The meeting was held for the purpose of determining whether Dr. Wojewski's surgery privileges should be "changed or modified" or if he should be allowed to conduct surgery. *See id.*

[¶21.]    In order to qualify for immunity, the professional review activity must "[relate] to the professional review action." 42 USCA § 11151(9). Therefore, the morning meeting must also "[relate] to a professional review action." *See id.* The meeting is related in both time and subject matter to the professional review action. The meeting had the same subject matter as the professional review action – whether Wojewski should be allowed to perform surgery due to potential danger of his manic episodes. The meeting occurred shortly before the fair panel hearing was called to determine Wojewski's surgical privileges. Because the meeting involved a modification or change in Wojewski's surgery privileges it is a professional review activity; and, because it was related to the professional review action, the meeting is entitled to immunity. *See Mathews*, 87 F3d at 634 (finding "a decision or recommendation to monitor the standard of care provided by a physician or factfinding to ascertain whether a physician has provided adequate care" are "professional review activities"); 42 USCA § 11151(9)-(10).

[¶22.]    Wojewski also claims the "ad hoc group" assembled that morning was not a "professional review body" carrying out "professional review action." The next determination is whether the group of doctors that met is a "professional review body" under HCQIA. "Professional review body" is defined as "a health care entity and the governing body or any committee of a health care entity which conducts professional review activity, and includes any committee of the medical staff of such

an entity when assisting the governing body in a professional review activity." 42 USCA § 11151(11).

[¶23.] The informal group of doctors was "assisting the governing body in a professional review activity," since it was determining whether Wojewski's surgical privileges should be modified. Wojewski argues that this cannot be a committee because they had never met prior to this meeting or subsequent to the meeting and it did not issue a formal decision or notes. However, the definition does not require the committee to be formal, appointed or elected or retain the same members. It states that "any committee of the medical staff" is a professional review body "when assisting the governing body in a professional review activity."

[¶24.] In any event, Wojewski may argue the group of doctors may not have immunity because they are not a "professional review body," but we do not need to determine if the informal group meets the definition. First, the definition of "professional review activity" includes activities of a health care entity. Dr. Hart, as the interim CEO, and Dr. Oury, the physician responsible for supervising Wojewski, along with the other doctors, were acting on behalf of RCRH, the health care entity.[6] Indeed, Wojewski concedes Dr. Hart and Dr. Allen were "acting on behalf of RCRH." Brief for Appellant at 23, Wojewski v. Rapid City Reg'l Hosp., No. 23954 (SD May 31, 2006). Second, the statute grants immunity to not only the

---

6. Officers are agents of corporations and act on their behalf. Z. Jill Barclift, *Senior Corporate Officers and the Duty of Candor: Do the CEO and CFO Have a Duty to Inform?*, 41 Val U L Rev 269, 276 (citing Lyman P. Q. Johnson & David Millon, *Recalling Why Corporate Officers are Fiduciaries*, 46 Wm & Mary L Rev 1597, 1617 (2004)).

"professional review body" but also "*any person who participates with or assists the body with respect to the action. . . .*" 42 USCA § 11111(a)(1)(A)-(D). Because the doctors were engaging in professional review activities related to the professional review action (revoking Wojewski's surgical privileges) the doctor's are immune from liability. *See* 42 USCA 11111(a)(1); 42 USCA 11151(9).

[¶25.]　　　　Wojewski claims that if we decide this group has immunity for the August 19 meeting and decision, then we would have to give immunity every time two doctors met over coffee and discussed another physician's qualifications. This argument downplays the power of this group of doctors[7] and is irreconcilable with Wojewski's other arguments. Wojewski argues that this same group had the power to stop, and in fact, should have, stopped him from performing surgery on August 19.[8] Yet, Wojewski wants to deny the group immunity for any decision because it

---

7.　　This also discounts the fact Wojewski signed a letter of agreement/conditions of reappointment, which made his work subject to pre-screening, supervision by Dr. Oury and review. At oral argument, he conceded this letter was peer review and affects his privileges.

8.　　At oral argument, Wojewski modified his argument slightly to allege the doctors should not have stopped the surgery, but instead should have called Dr. Frost and reported to him. Then the peer review would have started and the peer review committee could determine whether the surgery could have continued. This argument was made in the breach of contract section, alleging a failure to follow the Impair Physician Statement, but not made in the HCQIA argument. In the HCQIA argument, Wojewski specifically states, "Defendants fail[ed] to prevent an obviously sick man from performing heart surgery – *when they clearly had the power* and mechanisms at their avail to do so. . . ." Brief for Appellant at 14-15, *Wojewski*, No. 23954. In any event, whether the doctors followed the Impaired Physician Policy Statement is immaterial as the statute specifically defines when immunity applies and does not contemplate the effect of other Hospital procedures.

was not a professional review body or a committee assisting in the professional review action.

[¶26.] However, this was not a powerless group, or an impromptu discussion. This group was meeting to make a decision about Wojewski's surgical privileges. Dr. Oury was charged with the responsibility of overseeing Wojewski after his medical privileges were reinstated, Dr. Hart was the interim CEO of the hospital, and Dr. Allen, Jr. was the Medical Director of Surgical Services. If this group had the power, as Wojewski claims, to stop him from performing surgery, then it follows that it had the power to allow him to retain his surgical privileges. It is these types of decisions that HCQIA immunize from liability.

[¶27.] The HCQIA was created to immunize physicians and hospitals that revoke or punish physicians from liability in order to facilitate these types of decisions. As the First Circuit stated, "In order to encourage the type of peer review that would expose incompetent physicians, the HCQIA shields health care entities and individual physicians from liability for damages for actions performed in the course of monitoring the competence of health care personnel." *Singh*, 308 F3d at 31 (additional citations omitted). Any decision made in the August 19 meeting was made while "monitoring the competence of [Wojewski]." It follows that the decisions of the meeting should be immune from liability. Any other decision frustrates the congressional intent behind the HCQIA.

[¶28.] Even if we were to agree with Wojewski that the group does not meet the definition of "committee" conducting professional review activities, the physicians would still be immune from liability. As previously noted, immunity is

granted to "any person who participates with or assists the [professional review body] with respect to the [professional review action]. . . ." 42 USCA § 11111(a)(1); Fobbs v. Holy Cross Health System Corp., 789 F Supp 1054, 1062 (ED Cal 1992). These physicians were reviewing the surgical capabilities of Wojewski in order to determine if he should keep his surgical privileges. The "professional review action" in this case was to revoke Wojewski's surgical privileges and the meeting "assist[ed] the body with respect to the action." As the circuit court noted, the professional review activities are not limited to the first day that the fair hearing panel began its work, but are "interpreted broadly enough to focus on the evaluation and the preliminary investigation of whether a physician's privileges should be changed or modified or suspended."

[¶29.]     Finally, Wojewski argues, for the first time on appeal, that the meeting actions are not immune because the statutory standards in 42 USCA section 11112(a) were not met. Before a hospital's professional review action falls within the HCQIA's grant of immunity, four standards must be met. These standards require:

> [A] professional review action must be taken --
>
> (1)     in the reasonable belief that the action was in the furtherance of quality health care,
>
> (2)     after a reasonable effort to obtain the facts of the matter,
>
> (3)     after adequate notice and hearing procedures are afforded to the physician involved or after such other procedures as are fair to the physician under the circumstances, and
>
> (4)     in the reasonable belief that the action was warranted by the facts known after such reasonable effort to obtain facts and after meeting the requirement of paragraph (3).

42 USCA § 11112(a). There is a presumption that the professional review action has met the statutory standards, "unless the presumption is rebutted by a preponderance of the evidence." *Id.*

[¶30.]     Wojewski concedes the professional review action after the surgery incident meets the standards. The August 19 morning meeting is a part of the professional review action. The individual parts of the professional review action do not need to meet the standards, just the professional review action as a whole. As the court noted in *Fobbs*, "[t]he HCQIA does not require that a professional review body's entire course of investigative conduct meet particular standards in order for it to be immune from liability for its ultimate decision." 789 FSupp at 1065.[9] Therefore, only the professional review action (revocation of privileges) must meet

---

9.     In so deciding, the court illustrated the problem with applying the standards to initial acts required to complete the final professional review action:

> [I]t would be impossible to apply the § 11112(a) standard to acts which are encompassed within the standard. For example, the standard requires that reasonable efforts be made to obtain the facts of the matter, the facts of the matter meaning those upon which the professional review action was based. These facts will be called facts "Y". Plaintiff would apparently require that the whole § 11112(a) standard apply to the process of gathering facts "Y". In other words, before a fact "Y" investigation is undertaken plaintiff would require that a reasonable effort be made to obtain the facts supporting the act of initiating a fact "Y" investigation, in addition to adequate notice and hearing regarding the fact "Y" investigation. This is nonsensical. The standard is intended to apply to discrete decisions, not to an ongoing course of conduct.

*Fobbs*, 789 FSupp at 1065.

the standard. Wojewski concedes the revocation of his privileges meets the standard, therefore his argument fails.

[¶31.] Finally, Wojewski spends much of his brief arguing the individual doctors knew or should have known Wojewski was suffering from a manic episode. He also finds fault with the individual doctors' actions or inaction in deciding he could still perform surgery. However, neither Wojewski nor his wife informed the hospital of his relapse.[10] In any event, whether the hospital knew or should have known or Wojewski should have informed the hospital is of no consequence. The discussion and the decision made during the August 19 morning meeting is immune, regardless of who knew or should have known of his manic state.

[¶32.] Any other interpretation than today's decision would frustrate the congressional intent behind the HCQIA. It was designed to facilitate peer review of potentially incompetent doctors in order to improve health care and protect patients. Taking Wojewski's argument to its logical consequence, no doctors would ever meet to discuss whether they should stop a surgeon from conducting surgery because they would be liable for their discussion and any subsequent decision.[11] Wojewski's claim is merely a backdoor attempt at recovering damages from the revocation of his license when he knows he cannot recover from that decision.

---

10. According to the Fair Hearing Panel Recommendation, Wojewski's wife knew that he was suffering from a relapse and she did not tell the hospital in order to preserve his reputation.

11. This opinion states "any decision" because if we agreed with Wojewski's argument, then he could have sued had the doctors prevented him from conducting surgery, and the fair hearing panel revoked his privileges, even though this is exactly what he argues in his brief that they should have done.

However, the August 19 meeting assisted the professional review body in its professional review action and is encompassed in the decision. This is so even though the group was informal, rather than formal, which may be the preferred procedure to avoid litigation. The persons involved in the meeting and the decision of the August 19 meeting are immune from damages liability. Therefore, it is not necessary to reach the state law claims.

[¶33.]    Affirmed.

[¶34.]    GILBERTSON, Chief Justice, and KONENKAMP and ZINTER, Justices, concur.

[¶35.]    MEIERHENRY, Justice, concurs specially.

MEIERHENRY, Justice (concurring specially).

[¶36.]    I concur and write to clarify the term "clinical privileges" as defined in the Health Care Quality Improvement Act (HCQIA). Pursuant to the HCQIA, Congress has granted immunity to participants engaged in professional review actions. Sugarbaker v. SSM Health Care, 190 F3d 905, 911 (8thCir 1999). Whether an action is a "professional review action" necessarily requires the action to adversely affect "clinical privileges." Mathews v. Lancaster General Hospital, 87 F3d 624, 633 (3dCir 1996). "Professional review action" is defined as:

> An action or recommendation of a professional review body which is taken or made in the conduct of professional review activity, which is based on the competence or professional conduct of an individual physician. . . and which affects (or may affect) adversely the ***clinical privileges***, or membership in a professional society, of the physician.

42 USCA § 11151(9) (emphasis added). "The definition of 'professional review action' encompasses decisions or recommendations by peer review bodies that

directly curtail a physician's clinical privileges or impose some lesser sanction that may eventually affect a physician's privileges." *Mathews*, 87 F3d at 634. "Clinical privileges" is specifically defined by 42 U.S.C.A. § 11151(3) as follows:

> The term "clinical privileges" includes privileges, membership on the medical staff, and the other circumstances pertaining to the furnishing of medical care under which a physician or other licensed health care practitioner is permitted to furnish such care by a health care entity.

[¶37.]     On the morning of August 19, 2003, an informal group of doctors met to determine if Wojewski was able to perform a surgery he had scheduled. The majority concludes that the doctors who informally met that morning were immune from liability because they were engaged in professional review activities related to . . . revoking Wojewski's surgical privileges. *See supra*, ¶24. This conclusion overstates what actually occurred. The doctors only met to decide whether Wojewski was capable of doing surgery that morning. The doctors decided he was and took no further action. It was not until after the Fair Hearing Panel conducted a hearing that Wojewski's clinical privileges were directly curtailed. The doctors' informal meeting conforms to the definition of investigatory action to assist the review process, thus still protected by HCQIA. Austin v. McNamara, 979 F2d 728, 736-78 (9thCir 1992) (holding that the actual decision to suspend privileges and the investigatory process leading up to that decision were immune under HCQIA); 42 USCA § 11151(10) (defining professional review activity). Although the outcome of

this case does not rest on the definition of "clinical privileges," we must be mindful

of the breadth we give this term for future claims brought under HCQIA.[12]

---

12. While the term "clinical privileges" as used in 42 USCA 11151(3) has not been interpreted by courts, cases analyzing whether an action by a health care entity constitutes a "professional review action" generally involve the revocation of *all* clinical privileges for a certain period of time rather than a decision to prevent a medical professional from performing one isolated act or duty. *See* Gordon v. Lewistown Hospital, 423 F3d 184 (3dCir 2005) (reviewing suspension of ophthalmologist's medical-dental staff privileges); Gabaldoni v. Washington County Hospital Association, 250 F3d 255 (4thCir 2001) (reviewing termination of obstetrician whose clinical privileges were terminated); *Mathews*, 87 F3d 624 (stating that no professional review action occurred until the board voted to suspend doctor's privileges) (citing *Austin*, 979 F2d 728 (determining that "action" had not been taken until a professional review body limited his clinical privileges).