#24710-aff in pt & rev in pt & rem-DG

**2008 SD 107**

IN THE SUPREME COURT
OF THE
STATE OF SOUTH DAKOTA

* * * *

JAMES SCOTT KIRLIN
and KRISTIN KIRLIN,                                          Plaintiffs and Appellants,

   v.

KIM HALVERSON,                                              Defendant,

KELLY CAWTHORNE, and PKJ,
INC., d/b/a EMPIRE HVAC,                                    Defendants and Appellees.

* * * *
APPEAL FROM THE CIRCUIT COURT OF
THE SECOND JUDICIAL CIRCUIT
MINNEHAHA COUNTY, SOUTH DAKOTA

* * * *
HONORABLE WILLIAM J. SRSTKA, JR.
Judge

* * * *

N. DEAN NASSER, Jr.
Nasser Law Offices, PC
Sioux Falls, South Dakota                    Attorneys for plaintiffs
                                             and appellants.

MICHAEL L. LUCE
Luce Law Office
Sioux Falls, South Dakota                    Attorney for defendants and
                                             appellees Kelly Cawthorne and
                                             PKJ, Inc., d/b/a Empire HVAC.

DANIEL K. BRENDTRO
Sioux Falls, South Dakota                    Attorney for defendants and
                                             appellees Kelly Cawthorne and
                                             PKJ, Inc. d/b/a Empire HVAC.

* * * *

ARGUED APRIL 22, 2008

OPINION FILED **11/05/08**

#24710

GILBERTSON, Chief Justice

[¶1.] On August 31, 2005, plaintiff James Scott Kirlin (Kirlin) commenced a lawsuit in the South Dakota Second Judicial Circuit for personal injuries and other losses against defendants Kim Halverson (Halverson), Kelly Cawthorne (Cawthorne) and PKJ, Inc. d/b/a Empire HVAC (PKJ) resulting from an assault that Halverson perpetrated upon Kirlin. Kirlin's wife, plaintiff Kristin Kirlin, concurrently commenced an action against the defendants for loss of consortium. The Kirlins' claims against Cawthorne and PKJ, Inc. alleged liability based on alternative theories of *respondeat superior*, civil conspiracy, and negligence. Cawthorne and PKJ moved for summary judgment. The circuit court granted their motion and we affirm in part, reverse in part and remand.

## FACTS AND PROCEDURE

[¶2.] Cawthorne worked in the heating, ventilation and air conditioning (HVAC) business in Sioux Falls, South Dakota. Cawthorne, his wife, Pamela Cawthorne, and father, John Cawthorne were equal shareholders in PKJ and operated an HVAC business through that entity. Cawthorne managed the operations of the business. By the spring of 2005, PKJ had been in business for about 15 years and serviced approximately 580 accounts in Sioux Falls. One of those accounts was the Empire Mall where PKJ was the principal HVAC service provider.

[¶3.] By the spring of 2005, Cawthorne learned that the Macerich Corporation, owner of the Empire Mall, was reevaluating its HVAC servicing arrangements. Macerich entered into a nationwide contract with Carrier Commercial Services (Carrier) for HVAC maintenance at its retail malls, including

the Empire Mall. There is some disagreement between the parties as to the precise moment at which Cawthorne learned that PKJ had lost its contract with Macerich. However, it is clear that Cawthorne and PKJ were aware Carrier had secured the contract to do work previously performed by PKJ at the Empire Mall by the time of the events relevant to this lawsuit.

[¶4.] On June 15, 2005, Cawthorne was atop the Empire Mall performing duct maintenance when he spotted Kirlin, wearing a Carrier uniform, working on an HVAC unit. Cawthorne was admittedly incensed upon seeing a Carrier employee performing work that for the previous 15 years had been performed by PKJ. He "just felt compelled to go over there and ask him who he was and what was he doing." Kirlin testified during his deposition that as soon as he told Cawthorne that he worked for Carrier and that he was performing maintenance on the HVAC units, Cawthorne "immediately started yelling obscenities at me . . . ." Kirlin stated that he tried to settle Cawthorne down and that he extended his hand to Cawthorne in an attempt to shake hands. At this point, Cawthorne batted Kirlin's hand away and continued to berate him.

[¶5.] Eventually, Kirlin called the Empire Mall operation's manager, Tim Kelly (Kelly), to come up and "defuse the situation . . . ." Kelly told Cawthorne that he was to stay away from Kirlin and leave him to his work. Cawthorne was made aware that Kirlin, who came from Omaha, Nebraska to service the HVAC units, would be at the Empire Mall for several more days performing maintenance.

[¶6.] On the following day, June 16, 2005, Cawthorne assigned Halverson to the Empire Mall to continue the duct maintenance. Halverson had been employed by PKJ for about 10 years. He was also married to a cousin of Pamela Cawthorne.

Kirlin was again on the rooftop and had crawled inside the "penthouse," a storage shack atop the mall, to get some air conditioning filters. PKJ kept "thousands of dollars worth of motors, refrigerants, and other parts" as well as filters in the penthouse. Kirlin had been informed by Kelly that he was free to use the filters stored inside the penthouse.

[¶7.] As Kirlin was crawling out of the penthouse with an arm full of filters, he was met by Halverson. Halverson testified at his deposition that he told Kirlin, "if you work for Carrier, you can get your own filters" and that "[Kirlin] wasn't going to use our filters[.]" Kirlin, stated he "decided just not to cause any waves and [to] set the filters down." Kirlin then "asked Mr. Halverson why he was making it so tough on us up here." At that point, "[Halverson] grabbed ahold [sic] of me . . . and started slamming me up against the building[.]" According to Kirlin, Halverson said to him, "you're that little faggot that waved at me, aren't you? You think you're fuckin' smart, don't you?" Kirlin denied Halverson's allegation and asked him who he was. Seeing the name "Kim" on Halverson's uniform, he then asked if that was Halverson's name to which he replied, "yeah, my name's Kim, have you got a problem with that?" Halverson continued to slam Kirlin against the penthouse and insinuate that he had gestured to him the day before. Kirlin told Halverson that he was going to call the police. Halverson replied, "go ahead and call the cops you little fucker." However, as Kirlin grabbed his phone to call the police, Halverson knocked it from his hand and shoved him. Kirlin then decided to "get the heck out of there." As Kirlin was back-stepping, he "struck out" at Halverson hitting him on the chin "once, maybe twice" with a closed fist. Halverson then started chasing Kirlin around the rooftop eventually catching him, then

beating and kicking him into unconsciousness. When Kirlin awoke, police and fire department EMTs were at his side.

[¶8.]        Halverson was arrested and charged with aggravated assault, simple assault and interference with emergency communications. He was acquitted on the aggravated assault charge, but was convicted of simple assault and the interference charge. He was sentenced to 365 days and 30 days in jail for the convictions, to be served concurrently. While the criminal prosecutions were proceeding against Halverson, the Kirlins commenced their civil actions against Halverson, Cawthorne and PKJ. Cawthorne and PKJ filed a motion for summary judgment in regard to the theories of *respondeat superior* and civil conspiracy, as well as the various forms of negligence that the Kirlins set forth as a basis for liability. The motion was heard on September 4, 2007. On October 12, 2007, the circuit court entered its memorandum opinion granting summary judgment for Cawthorne and PKJ.

[¶9.]        The Kirlins raise four issues on appeal:

> 1.     Whether the record establishes a basis for vicarious liability of Cawthorne and PKJ on a theory of *respondeat superior* for injuries inflicted upon Kirlins by an on-duty employee of PKJ.
>
> 2.     Whether or not Halverson departed from the scope of his employment, does a genuine issue of material fact exist on any theory brought against Cawthorne and PKJ based on a tort duty arising under Restatement (Second) of Torts, § 317, or any other basis of negligence out of which a duty can arise.

3. Whether the record establishes a basis for the liability of Cawthorne and PKJ on a theory of civil conspiracy.

4. Whether the record establishes clear and convincing evidence that there is a reasonable basis to believe willful, wanton, or malicious conduct by Cawthorne and PKJ, supporting punitive damages.

## STANDARD OF REVIEW

[¶10.] Our standard of review of a circuit court's grant of summary judgment is well settled:

> [W]e must determine whether the moving party demonstrated the absence of any genuine issue of material fact and showed entitlement to judgment on the merits as a matter of law. The evidence must be viewed most favorably to the nonmoving party and reasonable doubts should be resolved against the moving party. The nonmoving party, however, must present specific facts showing that a genuine, material issue for trial exists. Our task on appeal is to determine only whether a genuine issue of material fact exists and whether the law was correctly applied. If there exists any basis which supports the ruling of the trial court, affirmance of a summary judgment is proper.

Wojewski v. Rapid City Reg'l Hosp., Inc., 2007 SD 33, ¶12, 730 NW2d 626, 631 (quoting Read v. McKennan Hosp., 2000 SD 66, ¶8, 610 NW2d 782, 784) (additional citations omitted). "The existence of a duty in a negligence action is a question of law subject to de novo review by this Court." Hohm v. City of Rapid City, 2008 SD 65, ¶3, 753 NW2d 895, 898 (citing State Auto Ins. Companies v. B.N.C., 2005 SD 89, ¶20, 702 NW2d 379, 386).

## ANALYSIS AND DECISION[1]

---

1. To avoid awkward grammatical structures and for the ease of reading, the Kirlins' claims will be discussed in the singular.

[¶11.]    **1.    Whether the record establishes a basis for vicarious liability of Cawthorne and PKJ on a theory of *respondeat superior* for injuries inflicted upon Kirlin by an on-duty employee of PKJ.**

[¶12.]    The ancient doctrine of *respondeat superior* is well established as "holding an employer or principal liable for the employee's or agent's wrongful acts committed within the scope of the employment or agency." *Black's Law Dictionary*, (8th ed 2004). In giving meaning to the phrase "within the scope of employment," we have stated:

> "[W]ithin the scope of employment" has been called vague but flexible, referring to "those acts which are so closely connected with what the servant is employed to do, and so fairly and reasonably incidental to it, that they may be regarded as methods, even though quite improper ones, of carrying out the objectives of the employment."

Deuchar v. Foland Ranch, Inc., 410 NW2d 177, 180 (SD 1987) (quoting *Prosser and Keeton on the Law of Torts* § 70, at 502 (5th ed W. Keeton 1984)).

[¶13.]    In *Leafgreen v. American Family Mutual Insurance Co.*, 393 NW2d 275 (SD 1986), this Court adopted a "foreseeability" test to determine whether an agent's acts were within the scope of employment:

> We think it fairly stated that a principal is liable for tortious harm caused by an agent where a nexus sufficient to make the harm foreseeable exists between the agent's employment and the activity which actually caused the injury; foreseeable is used in the sense that the employee's conduct must not be so unusual or startling that it would be unfair to include the loss caused by the injury among the costs of the employer's business.

*Id.* at 280-81.

[¶14.]     "Foreseeability" as used in the *respondeat superior* context is different from "foreseeability" as used for proximate causation analysis in tort law.  *Id.* at 280.  In *respondeat superior,* foreseeability includes a range of conduct which is "fairly regarded as typical of *or broadly incidental to* the enterprise undertaken by the employer." *Id.* (citing Rodgers v. Kemper Construction Co., 50 CalApp3d 608, 618-19 (1975)) (emphasis added).  The *Leafgreen* foreseeability formulation was guided by *Rodgers* and the Restatement (Second) of Agency.   Both continue to provide guidance on what is foreseeable and, therefore, what is within the scope of employment.

[¶15.]     *Rodgers* illustrates the breadth and application of the *respondeat superior* foreseeability test.  Its conclusion is highly relevant to this case because of the factual similarities.  In *Rodgers*, two employees of a subcontractor argued with and assaulted two employees of a general contractor at a common worksite.  The assault knocked one of the victims unconscious, led to severe injuries necessitating multiple surgeries, and resulted in permanent disability.  The second victim was left with permanent double vision.  These actions were deemed within the scope of employment because such assaults were foreseeable to the principal/employer.  The court explained:

> In the instant case, it was reasonably to be expected that Kemper's employees would come in contact with employees of other contractors on the same project.  The risk of such association, as explained in *Carr*[2]. . . extends to expressions of

---

2.     Carr v. Wm. C. Crowell Co., 28 Cal2d 652, 171 P2d 5 (1946) (Vicarious liability was found against the principal when a laborer from one company threw a hammer at a laborer from another company at a common worksite

(continued . . .)

> normal human traits which, unhappily, include occasional emotional flareups and propensity for violence. In the case at bench the quarrel on the job site, though between employees of different contractors . . . was manifestly an outgrowth of the employment relationship and a risk which may fairly be considered as typical of, or incidental to, the employment.

*Rodgers*, 50 CalApp3d, 622-23 (citations omitted). Therefore, given the precedent from which South Dakota's foreseeability test was born, assaults between workmen can be foreseeable.

[¶16.] "This Court has specifically held that the question of whether the act of a servant was within the scope of employment must, in most cases, be a question of fact for the jury." *Deuchar*, 410 NW2d at 181 (citing Lovejoy v. Campbell, 16 SD 231, 237, 92 NW 24, 26 (1902)). *See* Restatement (Second) of Agency § 228, comment d.[3] Given the possibility that workmen's assaults *can* be foreseeable and are "typical of, or incidental to, [their] employment," *Rodgers* at 623, it was incorrect for the circuit court to conclude in this case that "[the foreseeability] determination may be made as a matter of law where an employee's 'deviation . . . is very marked and unusual." Fullmer v. State Farm Ins. Co., 498 NW2d 357, 363 (SD 1993) (citing *Lovejoy*, 16 SD at 237, 92 NW at 26). Genuine factual issues remain as to whether *this* assault was foreseeable.

_____

(. . . continued)
> after they briefly quarreled. The hammer hit the victim in the head and seriously injured him.)

3.   Restatement (Second) of Agency § 228, comment d states:
> The question whether or not the act done is so different from the act authorized that it is not within the scope of the employment is decided by the court if the answer is clearly indicated; otherwise, it is decided by the jury.

[¶17.]     "To determine if a servant's act is within the scope of employment, numerous factors should be considered." *Deuchar,* 410 NW2d at 180.  In applying the foreseeability test, the *Leafgreen* court broadly considered four factors which suggested that the agent's conduct was unforeseeable:

> 1) No benefit ran to the principal,
> 2) The burglary was remote in time from the principal's involvement with the victims,
> 3) The opportunity to commit the act arose out of the agent's personal relationship with the victims, outside of the agent's employment, and
> 4) Imposing liability on employers in these circumstances would be "unfair."

*Leafgreen,* 393 NW2d at 281.

[¶18.]     The Restatement (Second) of Agency has also been used as a source of other relevant factors to be considered by the fact finder.  *See Deuchar* at 180, n2. Restatement (Second) of Agency, § 228, *General Statement* [*regarding the Scope of Employment*], comment a. instructs, "[section] 245 states the special rule which applies when a servant intentionally[4] uses force against another person."  In whole Section 245 reads:

> A master is subject to liability for the intended tortious harm by a servant to the person or things of another by an act done in connection with the servant's employment, although the act was unauthorized, if the act was not unexpectable in view of the duties of the servant.

---

4.     *Deuchar* is factually distinguishable because it deals with a servant's *negligent* shooting of a third party, not an *intentional* use of force.  Halverson intentionally assaulted Kirlin.

[¶19.]    The thorough commentary to Restatement (Second) of Agency § 245[5] discusses a number of factors which should be considered when evaluating the intentional use of force.  The *general* factors listed in Restatement (Second) of Agency § 229 – *Kind of Conduct within Scope of Employment,* repeated in *Deuchar,* were considered by the trial court in its decision.  These factors are inappropriate given the more *specific* applicability of the "special rule" to the use of force.[6]

[¶20.]    Section 245, comment a. states:

> *Types of situations.*  Whether or not an employment involves or is likely to lead to, the use of force against the person or property of another is a matter of fact to be decided by the trier of fact.  Since opportunities and provocations arise in a great variety of ways, no attempt is made to make an exhaustive category of situations in which the master may be found liable.  However, certain situations recur with sufficient frequency to call for mention.  These occur when the servant:  (a) acts in the protection of or recaption of his master's property, or (b) in excess of zeal in competition, or (c) engages in a fight arising out of a dispute connected with his work for his employer.

Any of these three situations may describe Halverson's actions.

[¶21.]    It is undisputed that Halverson made contact with Kirlin in order to protect his employer's property.  While Halverson's job description might not *expressly* include such a duty, by his actions, Halverson apparently believed he had a duty to stop Kirlin from taking filters or other items stored in the penthouse.

---

5.    The commentary to Restatement (Second) of Agency § 245 fills almost six pages in the published volume.

6.    Because the use of force is fully discussed in Section 245, reliance on subsection j of Restatement (Second) of Agency § 229, "whether or not the act is seriously criminal," by the circuit court was incorrect.

Also, such a duty might be considered incidental to his other responsibilities. Therefore, genuine issues of material fact remain as to whether Halverson's use of force was foreseeable given his employment and the duties he undertook. A finder of fact must be given the opportunity to consider the circumstances which gave rise to this action and the factors discussed in section 245 in order to resolve these issues.

[¶22.]    The *Deuchar* court considered the "employee's intent" a relevant factor for determining the scope of employment. Citing Professors Prosser and Keeton, this Court stated:

> An essential focus of inquiry remains: Were the servant's acts in furtherance of his employment? If the answer is yes, then employer liability may exist even if his servant's conduct was expressly forbidden by the master. . . When a servant acts with an intention to serve solely his own interests, this act is not within the scope of employment, and his master may not be held liable for it.

*Deuchar,* 410 NW2d at 181. Prosser and Keeton further explain:

> It may be said, in general, that the master is held liable for any *intentional tort* committed by the servant where its purpose, *however misguided*, is wholly or in part to further the master's business. . . But if [the servant] acts from *purely personal* motives, because of a quarrel over his wife which is in no way connected with the employer's interests, he is considered in the ordinary case to have departed from his employment, and the master is not liable.

Prosser and Keeton on the Law of Torts §70, 505-06 (5th ed. 1984) (emphasis added).

[¶23.]    This "employee's intent" analysis for intentional torts closely comports with the language contained in the Restatement (Second) of Agency § 245,

-11-

Comment f. *Servant actuated by personal motives*.[7] *See* Baker v. St. Francis Hosp., 126 P3d 602, 607 (Okla 2005) (applying § 245, cmt. f).

[¶24.] Therefore, given our precedent applying the foreseeability test and the commentary contained in the Restatement (Second) of Agency § 245, when considering the intentional use of force by an employee, the fact finder must first determine whether the use of force was *wholly* motivated by the agent's personal interests or whether the act had a dual purpose, "that is, to serve the master and to further personal interests." *Deuchar*, 410 NW2d at 181. "When a servant acts with an intention to serve *solely* his own interests, this act is not within the scope of employment, and his master may not be held liable for it." *Id*. (emphasis added).

[¶25.] If the act was for a dual purpose, the fact finder must then consider the case presented and the factors relevant to the act's foreseeability in order to determine whether a nexus of foreseeability existed between the agent's employment and the activity which actually caused the injury. If such a nexus exists, the fact finder must, finally, consider whether the conduct is so unusual or

---

7.      Restatement (Second) of Agency § 245, comment f. *Servant actuated by personal motives*, states:

> The liability of a master for the use of force by a servant is not prevented by the fact that the servant acts in part because of a personal motive, such as revenge. The master, however, is relieved from liability under the rule stated in this Section if the servant has *no* intent to act on his master's behalf, although the events from which the tortious act follows arise while the servant is acting in the employment and the servant becomes angry because of them. The fact that the servant acts in an outrageous manner or inflicts a punishment out of all proportion to the necessities of his master's business is evidence indicating that the servant has departed from the scope of employment in performing the act. (emphasis added).

startling that it would be unfair to include the loss caused by the injury among the costs of the employer's business. *See generally Leafgreen,* 393 NW2d at 280-81.

[¶26.]	This case presents the kind of factual ambiguities that justify jury consideration of the scope-of-employment question. Although, no reasonable job description of an HVAC serviceman would include beating the competition's employees unconscious, our law of vicarious liability focuses on the foreseeability of such conduct, not the job description. Halverson was on the clock conducting PKJ's business when he encountered Kirlin. Halverson would not have been in the restricted area atop the Empire Mall but for his employment with PKJ. While Kirlin's own description of the incident suggests that the beating may have been motivated by Halverson's belief that Kirlin had gestured to him in an offensive manner on the previous day, there was also evidence to support the conclusion that Halverson's assault on Kirlin was motivated in part by his interest in protecting PKJ's property in the penthouse. The evidence might also imply that Halverson was motivated by the intent to further PKJ's business interests through discouraging the competition, albeit in a misguided and wholly unacceptable fashion.

[¶27.]	We reverse and remand to the circuit court. The circuit court erroneously granted summary judgment in favor of PKJ on this issue. Genuine issues of material fact remain whether Halverson was within the scope of his employment when he assaulted Kirlin.

[¶28.]	**2.	Whether or not Halverson departed from the scope of his employment, does a genuine issue of material fact exist on any theory brought against Cawthorne and PKJ based on a tort duty arising under Restatement (Second) of Torts, § 317, or any other basis of negligence out of which**

**a duty can arise.**

> There are three requirements in a negligence claim: "(1) a duty on the part of the defendant; (2) a failure to perform that duty; and (3) an injury to the plaintiff resulting from such a failure." The existence of a duty is a question of law that is reviewed de novo. While negligence actions are not generally suitable for summary judgment, it is appropriate when the duty question is resolved in favor of the defendant.

*State Auto Ins. Companies v. B.N.C.*, 2005 SD 89, ¶20, 702 NW2d 379, 386 (citations omitted).

[¶29.]     In this case, the circuit court granted PKJ and Cawthorne's motion for summary judgment on Kirlin's negligence claims. Summary judgment was based on the non-existence of a duty from PKJ or Cawthorne to Kirlin. Therefore, only the "duty" element of Kirlin's negligence claims is before us.[8] Kirlin's appeal asserts that PKJ and Cawthorne had three duties which they failed to uphold. First, the employers had a duty to control Halverson. Second, the employers owed a special duty to protect Kirlin from Halverson. Finally, the employers had a general duty of reasonable care in regard to carrying out their business.

[¶30.]     "Generally, the law imposes no duty to prevent the misconduct of a third person." *State Auto Ins. Companies,* 2005 SD 89, ¶22, 702 NW2d at 387. However, an employer may be held liable for negligent hiring, retention, training and supervision. *See* Rehm v. Lenz, 1996 SD 51, ¶21, 547 NW2d 560, 566 (recognizing that employers can be held responsible for negligent hiring, retention and supervision of their employees); *see also* Nelson v. Nelson Cattle Co., 513 NW2d

900, 904 (SD 1994) (holding that there was evidentiary support for the jury to conclude that the defendant did not provide an employee adequate supervision and instruction to carry out the duties he was assigned).

*Duty to Prevent the Misconduct of a Third Party*

[¶31.]     In a variety of situations, this Court has stated that in an allegation that a duty exists to prevent the misconduct of a third party, the plaintiff must show the existence of (1) a special relationship between the parties, and (2) that the third party's injurious act was foreseeable. *See State Auto Ins. Companies*, 2005 SD 89, ¶22, 702 NW2d at 387 (house sitter – homeowner); E.P. v. Riley, 1999 SD 163, 604 NW2d 7 (Department of Social Services owed a common-law duty to protect a child from harm inflicted by a foster child with known dangerous propensities); Walther v. KPKA Meadowlands Ltd. Partnership, 1998 SD 78, ¶41, 581 NW2d at 535 (landlord – tenant); Small v. McKennan Hosp., 437 NW2d 194, 199 (SD 1989) (landowner – invitee).  Kirlin alleges that, as a subset of the duty to prevent the misconduct of third persons, PKJ had a "duty to control" the conduct of its employee on top of the Empire Mall.

*1. Special Relationship*

[¶32.]     The Restatement (Second) of Torts, Section 315 reflects this Court's "special relationship" prong of the duty to prevent the misconduct of a third person, and is the starting point of our inquiry.

_____

(. . . continued)

8.     This appeal does not reach issues regarding the failure to perform (breach) or the resulting injury (causation and damages).  Summary judgment was granted on "duty" alone.

[¶33.] Restatement (Second) of Torts, Section 315 states:

> There is no duty so to control the conduct of a third person as to prevent him from causing physical harm to another unless
>
> > (a) a special relation exists between the actor and the third person which imposes a duty upon the actor to control the third person's conduct, or
> > (b) a special relation exists between the actor and the other which gives to the other a right to protection.

[¶34.] Restatement (Second) of Torts, Section 315, subsection (a) presents the requirements for a "special relationship" in a "duty to control" claim. In this subsection the "actor" is the party alleged to have the duty, here PKJ. The "third person" is the person to be controlled, here Halverson. Comment c. to this Section directs that "[t]he relations between the actor and a third person which require the actor to control the third person's conduct are stated in §§ 316-319." *See* Cuppy v. Bunch, 88 SD 22, 25, 214 NW2d 786, 788 (1974). In this case, we apply Restatement (Second) of Torts, Section 317, *Duty of Master to Control Conduct of Servant.*

[¶35.] Restatement (Second) of Torts, Section 317, states:

> A master is under a duty to exercise reasonable care so to control his servant while acting outside the scope of his employment as to prevent him from intentionally harming others or from so conducting himself as to create an unreasonable risk of bodily harm to them, if
>
> > (a) the servant
> > > (i) is upon the premises in possession of the master or upon which the servant is privileged to enter only as his servant, or
> > > (ii) is using a chattel of the master, and
> > (b) the master
> > > (i) knows or has reason to know that he has the ability to control his servant, and

> (ii) knows or should know of the necessity and
> opportunity for exercising such control.

[¶36.]     Applying this standard, if the jury was to conclude that Halverson's actions are outside the scope of employment under *respondeat superior* analysis,[9] because Halverson intentionally harmed Kirlin, and because Halverson was privileged to be atop the Empire Mall due only to his employment, then the sole question regarding Halverson's "special relationship" with PKJ is Restatement (Second) of Torts, Section 317, subsection (b)(i),[10] whether PKJ knew or had reason to know of its *ability to control* Halverson.

[¶37.]     The ability to control and the power to control are not well defined or discussed in the commentary to Section 317 or in our previous cases.  The ability to control arises from or is incident to the employer's general duties.  Comment b. explains:

> A master is required to police his own premises, and those upon which, though in possession of another, he has a privilege of entry for himself and his servants, to the extent of using reasonable care to exercise his authority as the master in order to prevent his servant from doing harm to others . . . he is not required, however, to exercise any control over the actions of his employees while on the public streets or in a neighboring restaurant during the lunch interval, even though *the fact that they are his servants may give him the power to control their actions by threatening to dismiss them from his employment* if they persist.

(emphasis added).

---

9.     *See* Issue 1, *supra.*

10.    Restatement (Second) of Torts, Section 317(b)(ii) addresses a question of foreseeability, to be discussed below.

[¶38.]     Therefore, the ability to control can be satisfied by the mere power to threaten dismissal.  Given the employment relationship, we believe PKJ was aware of *at least* this power.  Furthermore, PKJ exerted its power to assign Halverson to the roof of the mall on the morning in issue.  Simply stated, PKJ knew it had the ability to control or police Halverson's actions atop the Empire Mall because of its power to discipline, reassign or terminate Halverson's employment.  Consequently, under the "duty to control" issue a "special relationship" existed between PKJ and Halverson.[11]

---

11.     Restatement (Second) of Torts, Section 315, subsection (b) applies to Kirlin's "duty to protect" claim.  A special relationship must exist between PKJ and Kirlin prior to finding a legal duty sufficient to sustain this claim.  Section 315, comment c. provides:  "The relations between the actor and the other which require the actor to control the conduct of third persons for the protection of the other are stated in §§ 314A and 320."

Restatement (Second) of Torts, Section 314A does not suggest a special relationship between PKJ and Kirlin.  PKJ is not a common carrier (§ 314A (1)), an innkeeper (§ 314A (2)), a possessor of land who holds it open to the public (§ 314A (3)), or one who took custody of Kirlin voluntarily or pursuant to a statute (§ 314A (4)).

Restatement (Second) of Torts, Section 320 is also inapplicable.  Kirlin was neither deprived of his normal power of self-protection nor was he subject to persons *likely* to harm him.  Section 320, comment a., describes the scope of this Section.  This comment states:
> The rule stated in this Section is applicable to a sheriff or peace officer, a jailer or warden of a penal institution, officials in charge of a state asylum or hospital for the criminally insane, or to teachers or other persons in charge of a public school.  It is also applicable to persons conducting a private hospital or asylum, a private school, and to lessees of convict labor.

None of these situations apply to Kirlin.  Furthermore, Kirlin's situation is not similar enough in character to warrant consideration of extending this rule to a different context.  Therefore, no special relationship exists between PKJ and Kirlin.

(continued . . .)

## 2. Foreseeability

> Wrongful activity can be foreseeable upon common experience.
> We use the "totality of circumstances test" in evaluating
> foreseeability. Liability is not contingent upon foreseeability of
> the "extent of the harm or the manner in which it occurred."
> This means that the *exact harm* need not be foreseeable.
> Rather, the harm need only be *within the class* of reasonably
> foreseeable hazards that the duty exists to prevent.

*State Auto Ins. Companies*, 2005 SD 89, ¶25, 702 NW2d at 388-89 (citations

omitted) (emphasis added).

[¶39.]     Because a "special relationship" exists between PKJ and Halverson, we

next consider the foreseeability of Halverson's conduct under Kirlin's "duty of

control" claim. Restatement (Second) of Torts, Section 317(b)(ii), reflects our

"foreseeability" prong and requires that PKJ had knowledge of a *need to exert* the

ability to control Halverson.

[¶40.]     Looking at the totality of the circumstances, PKJ knew its employees

believed the penthouse on top of the Empire Mall only contained PKJ's property.

Second, PKJ knew its employees would confront other workmen near the

penthouse, as Cawthorne had on the previous day. Third, via Cawthorne, PKJ

knew that Carrier's agents, including Kirlin, would be working on top of the Empire

Mall for a number of days, taking items from the penthouse. Therefore, when PKJ

assigned Halverson to work at the Empire Mall, it was foreseeable that he would

_____

(. . . continued)

Because no special relationship exists, the circuit court was correct in
granting summary judgment on Kirlin's "duty to protect" claim. PKJ owes no
duty of protection to Kirlin. Kirlin has obliquely suggested other "special
relationships." We have considered these suggestions and none are
applicable to this case.

see Kirlin or another Carrier employee in or around the penthouse, confront the worker and attempt to reclaim what Halverson perceived to be PKJ's property. As mentioned in Issue 1, *supra.*, the use of force can be foreseen in the reclamation or protection of property in *respondeat superior*. While these are different inquiries that use the same word, we hold that a confrontation over PKJ's property is foreseeable for the purpose of establishing the legal duty of control in this situation. As stated above, the *extent* of a potential hazard does not need to be foreseeable, only that the *class* of such hazard reasonably exists.

*Conclusion – Duty to Prevent Misconduct of a Third Person*

[¶41.]     We do not suggest that employers are negligent simply because an employee assaults a third party. We conclude a "special relationship" existed between PKJ and Halverson due to his employment and the location of the attack. In the totality of the circumstances, knowledge of the prior day's conflict can be fairly imputed to PKJ. It was foreseeable to PKJ that Halverson would confront Kirlin regarding PKJ's property. Further, it was foreseeable that Halverson would use force to reclaim his employer's property. Therefore, Halverson's assault was foreseeable to PKJ for the purposes of establishing a legal "duty of control."

[¶42.]     With the duty question answered as a matter of law, it becomes a question for the jury to determine if the conduct of PKJ met or failed to meet that duty. If the jury determines that PKJ failed to meet its duty, then it must decide whether that failure caused Kirlin damage. Therefore, we reverse and remand for a jury's determination on these issues.

*Duty of Reasonable Care*

[¶43.] Kirlin asserts PKJ has a general duty of care when carrying out its business. This argument to a great extent overlaps with Kirlin's duty of control claim. However, there is a subtle difference between these two. The duty of control concerns PKJ's handling of its special relationship with Halverson; the general duty concerns PKJ's duty to conduct *itself* reasonably.

[¶44.] In essence, Kirlin's "duty of reasonable care" argument presents four theories of negligence: 1) negligent hiring, 2) negligent retention, 3) negligent training, and 4) negligent supervision. Differentiation of Kirlin's claims clarifies the assertion that a general duty of reasonable care exists in this case.

[¶45.] Broadly stated, a negligent hiring claim suggests that *at the time an employee was hired*, it was negligent for an employer to engage the employee's services based on what the employer knew or should have known about the employee. A negligent retention claim alleges that information which the employer came to know, or should have become aware of, *after hiring the employee* made continued employment of the employee negligent. *See* Yunker v. Honeywell, Inc., 496 NW2d 419, 422-424 (Minn 1993). A negligent training claim suggests that the manner or circumstances of the employee's training by the employer inadequately or defectively *coached, educated, or prepared* its employees for the performance of their job duties.[12] Finally, a negligent supervision claim alleges that the employer

---

12. American Heritage College Dictionary (3rd ed 1997), p 1434:
   train. *v.* 1. To coach in or accustom to a mode of behavior or performance.
   2. To make proficient with specialized instruction and practice.

inadequately or defectively *managed, directed or oversaw* its employees.[13]  Thus,

Kirlin presents four perspectives from which to analyze the duty question.

### 1. Negligent Hiring and Retention

[¶46.]    Kirlin's arguments regarding negligent hiring and retention include

the same basic traits.  Kirlin alleges that Halverson has a violent background of

which PKJ was aware, or should have been aware.  Kirlin suggests this background

made him a danger to others.  Kirlin presents Halverson's history of violations of

the law including prior arrests for assault and a conviction for resisting arrest.

Further, Kirlin suggests that Halverson's history as a high school wrestler, former

bull rider on the rodeo circuit and United States Marine evince his violent

tendencies.

[¶47.]    We observe that courts addressing the amount of inquiry required into

an applicant's history have concluded that when an employee's contact with the

public is minimal there is no duty to perform a background check.  *See* Connes v.

Molalla Trans. Sys., 831 P2d 1316, 1321-22 (Colo 1992) (concluding that the scope of

an employer's duty in exercising reasonable care in hiring depends largely on the

anticipated degree of contact the employee will have with others in the normal

course of employment.  Accordingly, where the employment calls for minimal

contact between the employee and others, there may be no reason to conduct an

investigation beyond obtaining prior employment information and personal

---

13.    Black's Law Dictionary (8th ed 2004):
       supervision, *n*. The act of managing, directing, or overseeing persons or
       projects.

interview data); Garcia v. Duffy, 492 So2d 435, 441-42 (FlaApp 1986) (holding that an employer had no duty to investigate an applicant's background where job duties involved incidental contact with the public).

[¶48.] Conversely, where job requirements bring an employee into frequent contact with the public, or individuals who have special relationships with the employer, the inquiry required expands beyond the job application and personal interview to an investigation of the applicant/employee's background. *See* Williams v. Feather Sound, Inc., 386 So2d 1238, 1240 (FlaApp 1980) (recognizing that an employer had no duty to investigate an applicant's background where he was hired for outdoor maintenance of townhouses and minimal contact with tenants. However, the duty to perform an investigation increased when the employee was transferred to inside work with access to pass keys); Ponticas v. K.M.S. Investments, 331 NW2d 907, 913 (Minn 1983) (recognizing that concerning a yard man, a production line worker or other such positions where the employee does not pose a high risk of injury to third persons, minimal investigation in hiring is required. However, an apartment manager's extensive contact with tenants and access to their apartments carries a duty to conduct an adequate background check); C.K. Security Systems, Inc. v. Hartford Acc. & Indem. Co, 223 SE2d 453, 455 (GaApp 1976) (higher duty when hiring uniformed hotel security guards).

[¶49.] The nature of Halverson's employment with PKJ did not expose him to frequent contact with the public. Empire Mall operations manager, Kelly, testified that even on a "busy day" there may be "five or six contractors" on the expansive roof of the Empire Mall. Furthermore, there is no indication that Halverson had

more than incidental contact with the public. Therefore, PKJ did not have a duty to perform a background check on Halverson, as a matter of law.

[¶50.] Cawthorne did admit his awareness that Halverson had been arrested as a result of a November 29, 1997 domestic dispute with his wife. As a result, Halverson had been charged with aggravated and simple assault and resisting arrest. Although Halverson was acquitted of the assault charges, he was convicted of resisting arrest and sentenced to one year in jail. However, the record contains no evidence of any violent episodes in the workplace. Further, there are no incidents of violence in Halverson's private life between the 1997 arrest and the assault on Kirlin in 2005.

[¶51.] Halverson's record of violations of the law is lengthy. Halverson's record reveals one simple assault charge stemming from a December 1995 arrest which was subsequently dismissed; three citations for failure to maintain financial responsibility, each of which was dismissed; one traffic-light violation; three seat belt violations; fifteen speeding citations; one failure to renew a vehicle registration; one grand theft charge which was dismissed; one failure to use a child restraint device; one citation for towing a trailer without safety chains and one citation for violating brake regulations.

[¶52.] We conclude PKJ was not under a duty to terminate Halverson's employment because of this history, as a matter of a duty of reasonable care. To hold otherwise would create severe consequences for employees throughout the state. "[P]ublic policy is a major consideration in identifying a legal duty.'" *Yunker*, 496 NW2d at 421. Imposing such a duty in this case, under these circumstances,

would expose employers of those with *some* evidence of a violent past to potential liability. Such a risk of liability might make employers hesitant to hire those people, severely limiting employment opportunities. Halverson's history of *violence* only includes a single conviction which resulted from a domestic, not workplace, confrontation[14] and an assault charge that was dismissed. Requiring employers to fire employees or face liability under these circumstances is untenable, especially considering Halverson's minimal contact with others. "Such a rule would deter employers from hiring workers with a criminal record and 'offend our civilized concept that society must make a reasonable effort to rehabilitate those who have erred so they can be assimilated into the community.'" *Yunker,* 496 NW2d at 423 (citation omitted).

[¶53.] We reject any notion that a person presents a risk to others for violent acts merely because he has been a wrestler, a bull rider and/or a Marine.

---

14. Halverson's single conviction and single prior arrest for assault do not rise to the level of a "person having dangerous propensities," discussed in Restatement (Second) of Torts § 319, *Duty Of Those In Charge Of Person Having Dangerous Propensities:*

> One who takes charge of a third person whom he knows or should know to be likely to cause bodily harm to others if not controlled is under a duty to exercise reasonable care to control the third person to prevent him from doing such harm.

While there are, inevitably, situations where this Section might apply, this opinion makes no comment on the "class of persons" discussed under that Section. Suffice it to say that Halverson's history does not indicate that his is a case remotely similar to the disease bearer or homicidal maniac discussed in the illustrations. Further, there is no suggestion that he has a "peculiar tendency" to act with violence.

### 2. *Negligent Training*

[¶54.]    Kirlin has presented no facts or circumstances which implicate PKJ's preparation or training of Halverson for the execution of his duties.  A suggestion that an employer should *train* employees not to attack others is inexact.  We believe this notion is more appropriately considered negligent supervision.  The circuit court's order of summary judgment is affirmed on the issue of negligent training.

### 3. *Negligent Supervision*

[¶55.]    Given the circumstances and resolution of the PKJ/Carrier/Empire Mall conversation the previous day, PKJ may have failed to act reasonably by *not* informing Halverson that others would be removing items from the penthouse when it assigned him work on top of the Empire Mall.  The record suggests that Cawthorne had no discussion whatsoever with Halverson regarding his argument with Kirlin at the worksite, the manner in which that argument was resolved, the loss of the contract with the Empire Mall's owners, the involvement of Kelley to resolve the conflict, or the status of the HVAC equipment in the penthouse.  Such a discussion or notification about PKJ's changed interests atop the Empire Mall might have prevented Halverson from confronting Kirlin in an aggressive/protective manner.  If Halverson had not confronted Kirlin about PKJ's property, the later assault, whatever its motivation, might not have occurred.

[¶56.]    A fact finder could find that the directions and supervision provided by PKJ fell short of what is reasonably required of this company.  Whether PKJ or Cawthorne breached this duty and whether the breach was the proximate cause of

Kirlin's damages are questions for a jury after a full presentation of the facts. *See* Laber v. Koch, 383 NW2d 490, 493 (SD 1986).

*Conclusion – Duty of Reasonable Care*

[¶57.]     We do not agree with the circuit court's conclusion that the general duty of reasonable care, as a matter of law, does not exist in this case. The circuit court's order of summary judgment is reversed and remanded.

[¶58.]     **3.     Whether the record establishes a basis for the liability of Cawthorne and PKJ, Inc. on a theory of civil conspiracy.**

[¶59.]     "A civil conspiracy is, fundamentally, an *agreement* to commit a tort." Reuben C. Setliff, II, M.D., P.C., v. Stewart, 2005 SD 40, ¶27, 694 NW2d 859, 867 (*Setliff II*) (emphasis added) (citations omitted). To establish a *prima facie* case of civil conspiracy, the plaintiff must show:

> (1) two or more persons;
> (2) an object to be accomplished;
> (3) a meeting of the minds on the object or course of action to be taken;
> (4) *the commission of one or more unlawful overt acts*; and
> (5) damages as the proximate result of the conspiracy.

*Id*. ¶27, 866-67 (emphasis added) (citing Setliff v. Akins, 2000 SD 124, 616 NW2d 878, 889 (*Setliff I*); *In re* TMJ Implants Prods. Liab. Litigation, 113 F3d 1484, 1498 (8thCir 1997)). *This is not an independent cause of action, but is "'sustainable only after an underlying tort claim has been established."'* *Id*. (citing Hanten v. School District of Riverview Gardens, 183 F3d 799, 809 (8thCir 1999) (quoting K & S Partnership v. Continental Bank, 952 F2d 971, 980 (8thCir 1991)).

[¶60.]     Kirlin's argument that Cawthorne and PKJ are liable on a theory of civil conspiracy fails. Kirlin's argument under this theory is not factually based. It

was based on suggestions that Cawthorne and Halverson had a familial relationship through marriage; that they hunted together; that Halverson had a 10-year employment relationship with Cawthorne; that the two worked side by side and that they were in constant phone communication with each other. The sum total, Kirlin's claim, constituted *evidence* that Halverson knew of Cawthorne's longstanding animus for Carrier and thereby must have shared his resentment. As a result, Kirlin alleges that an inference can be drawn that Cawthorne and Halverson must have conspired together to strong-arm Carrier and its employees out of Sioux Falls. This however, is speculation and not factually sufficient to resist a motion for summary judgment. *See Werner*, 499 NW2d at 140. Therefore, no error is shown in the circuit court's decision as to this issue.

*Individual Claims Against Cawthorne*

[¶61.] In examining the preceding issues, we find no factual or legal basis on which Cawthorne can be held liable individually. PKJ, the corporate entity, is Halverson's employer. Therefore, *respondeat superior* liability and liability for the duties of control and care pass to PKJ, not Cawthorne. As its agent, any negligent actions taken by Cawthorne in his capacity as Halverson's supervisor are the negligent acts of PKJ. Cawthorne's status as an owner of PKJ is immaterial to the issues presented. Therefore, the circuit court's grant of summary judgment to Cawthorne on all issues is affirmed.

[¶62.] Affirmed in part, reversed in part and remanded.[15]

---

15. Since under Issue 3 we affirm the circuit court's grant of summary judgment for Cawthorne and PKJ as to conspiracy, we need not address Kirlin's fourth

(continued . . .)

[¶63.]     SABERS, KONENKAMP, and ZINTER, Justices, concur.

[¶64.]     MEIERHENRY, Justice, concurs with a writing.


MEIERHENRY, Justice (concurring).

[¶65.]     I concur on all issues and only write to point out that the foreseeability test in Restatement (Second) of Agency § 228 for scope of employment analysis has been revised in Restatement (Third) of Agency § 7.07(2) (2006) and no longer relies on "foreseeability." *Id.* Although we still adhere to this "foreseeability" analysis today, we should perhaps consider the approach adopted by the Restatement (Third) of Agency in the future. No one has urged this here.

[¶66.]     Restatement (Third) of Agency § 7.07 no longer relies on the foreseeability test in determining whether an employee's acts are within the scope of employment, partly because of its confusion with foreseeability in the negligence context. *Id.* (Restatement (Second) of Agency has been superseded by Restatement (Third) of Agency, adopted in 2005 and published in 2006). The test for determining scope of employment for vicarious liability for an employee's tort in the Restatement (Third) of Agency § 7.07(2) provides as follows:

> An employee acts within the scope of employment when
> performing work assigned by the employer or engaging in a
> course of conduct subject to the employer's control. An
> employee's act is not within the scope of employment when it

_____

(. . . continued)
     issue in regard to punitive damages because Kirlin failed to state the requisite claim that Cawthorne and or PKJ acted "intentionally, or [perpetrated an act of] willful and wanton misconduct, in disregard of humanity." SDCL 21-3-2.

occurs within an independent course of conduct not intended by the employee to serve any purpose of the employer.

*Id.* Comment b to this section explains the difference between § 7.07(2) of Restatement (Third) of Agency and §§ 228 and 229 of Restatement (Second) of Agency (often relied on by this Court). *Id.* cmt. b. "The scope-of-employment doctrine in subsection (2) differs from its counterparts in Restatement Second, Agency §§ 228 and 229 because it is phrased in more general terms." *Id.* The comment points out:

> "Foreseeability" has a well-developed meaning in connection with negligence and to use it, additionally, to define a different boundary for respondeat superior risks confusion. Moreover, references to "foreseeability" in the respondeat superior context tend to conflate the foreseeable likelihood, from an employer's standpoint, that mishaps and slippage will occur in connection with the performance of assigned work, with the possibility that the work may lead to or somehow provide the occasion for intentional misconduct that is distinct from an employee's actions in performing assigned work. To be sure, the latter possibility is indeed always "foreseeable," given human frailty, but its occurrence is not a risk that an employer can effectively control and its occurrence may be related causally to employment no more than to other relationships and circumstances in an errant employee's life more generally.

*Id.* cmt. b. Additionally, comment c points out:

> An employee's assigned duties may also place the employee in situations in which physical consequences may follow in an uninterrupted sequence from verbal exchanges with third parties. An escalation in the pitch of an employee's conduct does not by itself transform the conduct into an independent course of conduct that represents a departure not within the scope of employment. ***It is a question of fact what motivated an employee's conduct as verbal exchanges escalate or when an employee's use of physical force becomes more pronounced.***

*Id.* cmt. c. (emphasis added). Although we have not previously referred to Restatement (Third) of Agency § 7.07, its reliance on employee intentions rather than foreseeability for scope of employment determinations is very similar to the employee-intent discussion used in *Deuchar* and discussed by Chief Justice Gilbertson. *See supra* ¶¶21-22; *Deuchar*, 410 NW2d 177; *see also* Patterson v. Blair, 172 SW3d 361 (Ky 2005).

[¶67.]    Nevertheless, under either test, issue one on vicarious liability involves issues of material fact that should not be decided by summary judgment.