Jerome E. FLEEGE, Special Administrator of the Estate of James P. Fleege, Deceased, Plaintiff and Appellant,

v.

John A. CIMPL, Defendant and Appellee.

No. 12926.

Supreme Court of South Dakota.

Argued Sept. 10, 1980.

Decided May 6, 1981.

James E. Doyle of Doyle, Bierle & Porter, Yankton, for plaintiff and appellant.

Michael F. Pieplow of Davenport, Evans, Hurwitz & Smith, Sioux Falls, for defendant and appellee.

BRADSHAW, Circuit Judge.

Jerome E. Fleege (appellant) brought a wrongful death action as special administrator of the estate of James P. Fleege (decedent). Appellant alleges that decedent was electrocuted by John A. Cimpl's (appellee's) electrical submerged pump while decedent was swimming in the Missouri River in Yankton, South Dakota. The jury returned a verdict for appellee and appellant appeals from the judgment entered upon the jury verdict. We reverse and remand for a new trial.

At the time of his death, decedent was fourteen years old and was just beginning his freshman year in high school. Decedent was in good health prior to his death and participated in athletics.

On August 25, 1978, at approximately 7:30 p. m., decedent and John DeJean, decedent's classmate and friend, decided to go swimming. They went to classmate Bob

Haney's home, whose residence overlooks the Missouri River. The boys went down to the Missouri River and jumped off a neighbor's houseboat into the river until the neighbor told them to stay off the boat.

The boys, with Bob Haney in the lead, then floated downstream with the current, although decedent and DeJean made one quick trip to shore. Bob Haney, who was farther out from shore than decedent and DeJean, passed appellee's dock without incident.

As decedent and DeJean approached appellee's dock, decedent was a little bit ahead of DeJean and was about five or six feet from the dock. DeJean testified on what happened next:

> Jim was out in front of me, and I felt bad electricity, you know, worse, you know, worse electricity I ever felt. So I yelled at them guys to get the heck out of the water. And I turned around and went back around the west side of the dock and I walked up there.

DeJean testified that after he got out of the water, he saw decedent, who was holding his chest, take two steps on the east side of the dock and then fall down on the dock.

At that point, DeJean and Haney attempted to revive decedent using cardiopulmonary resuscitation and mouth-to-mouth resuscitation. Haney then went for help and returned with a neighbor, who helped with the resuscitation efforts. Decedent's lips, chest and back were blue but he did not vomit until sometime after Haney went to get the neighbor. Decedent was taken to a nearby hospital, where he died a short time later.

Two pathologists testified on the cause of decedent's death. Their opinions and conclusions were conflicting but both agreed that the findings of the autopsy would neither allow nor exclude the conclusion that decedent's death was the result of electrocution.

The electrical submerged pump in question is used to pump river water up a high bank onto appellee's lawn. Although the watering system had been in use for about four or five years, a new motor had been

put on the system approximately one week before decedent's death. According to the written warning, the motor is intended for operation in a well and is not to be used in a swimming pool. There was testimony that people used the area around appellee's dock for boating, swimming and water skiing.

The submerged pump was attached to a motor, which sat in a cradle in the water. Three wires emerged from the motor and led to a plug on the dock. There were two areas of splices on each of the three wires. One set of splices was near the pump motor and the second set of splices on each of the three wires was seven feet down from the plug.

There was expert testimony that several of these splices were improper and of poor quality not sufficient to withstand a water environment. There was also other evidence of improper or poor installation. Nevertheless, a number of tests conducted subsequent to decedent's death indicated that there was no electricity in the area of appellee's dock.

I

■ Appellant contends that the trial court erred in giving Jury Instruction No. 8, which stated:

> If you should find that the *medical testimony* shows only that the boy might have died or possibly died as a result of electrocution, and if you should find the probabilities of death are equal, then plaintiff will have failed in his burden of proof and you should find for the defendant. (Emphasis added)

The underlying question is not whether medical testimony was required, because there was testimony by medical experts; rather, the question is whether the jury could consider only the medical testimony in making its determination on decedent's cause of death. We conclude that this instruction improperly restricted the jury so that they were to consider only the medical testimony on what caused decedent's death. The jury should have been allowed to consider all of the testimony when deciding

whether appellant carried his burden of proof on cause of death.

The relevant medical testimony on cause of death consisted of the testimony of two pathologists, Dr. Thomas Johnson and Dr. Loyd Wagner. Dr. Johnson, the pathologist who performed the autopsy on decedent, testified that he could find no injury that could have been the cause of death. He further testified that there was an absence of findings that would indicate or be compatible with death by electrocution, but noted that the fact that there was such an absence of findings could be compatible with death by electrocution.

Dr. Wagner, a Sioux Falls pathologist, did not personally perform an autopsy on decedent but reviewed the results and evidence of Dr. Johnson's autopsy. Dr. Wagner testified that he "found no evidence that would either allow the diagnosis or exclude the diagnosis of electrocution as a cause of death." In summary, Dr. Wagner could not exclude electrocution as a cause of death.

Therefore, even though each pathologist attempted to rank what he considered to be the cause of death, there was no express medical testimony that decedent was or was not electrocuted. Instruction No. 8 implies that there had to be medical testimony that decedent was electrocuted. Apparently the pathologists were of the opinion that such medical testimony was not possible in this case.

■ It is incumbent on the plaintiff to introduce evidence which would afford a reasonable basis for the conclusion that it was more likely than not that the cause of death of James Fleege was from electrocution. *DeCourcy v. Trustees of Westminster Presby. Ch.*, 270 Minn. 560, 134 N.W.2d 326 (1965). The medical testimony here was not conclusive and must be termed "speculative." See generally *Lohr v. Watson*, 68 S.D. 298, 2 N.W.2d 6 (1942). But expert medical testimony is not always required to prove a reasonable basis for the jury to reach a conclusion concerning cause of death. *Howe v. Farmers Cooperative Creamery of Madison*, 81 S.D. 207, 132

N.W.2d 844 (1965); 22 Am.Jur.2d *Death* §§ 241–243 (1965); 31 Am.Jur.2d *Expert and Opinion Evidence* § 99 (1967). The inference that decedent was electrocuted was not speculative or conjectural, but provided a reasonable basis for a jury determination when the medical testimony in this case is combined with the testimony of other witnesses. If not precluded from consideration by Instruction No. 8, the testimony of the nonmedical witnesses would have aided the jury in providing foundation and filling in the gaps left by the medical testimony. See generally *Buie v. Birtell*, 213 Kan. 354, 516 P.2d 963 (1973); *Hansen v. Isaak*, 70 S.D. 529, 19 N.W.2d 521 (1945). According to Instruction No. 8, the jury was precluded from considering the most important testimony on electrocution as the cause of death—the testimony of John DeJean, who was in the water near decedent and who testified that he felt electricity in the water. The jury should have been instructed that they could consider all testimony, not only the medical testimony, in determining cause of death.

Additionally, we find the language of Instruction No. 8 confusing. The second part of the instruction ("and if you should find the probabilities of death are equal") makes no reference to cause of death or to the various possibilities of cause of death.

Considering the jury instructions as a whole, *Dwyer v. Christensen*, 77 S.D. 381, 92 N.W.2d 199 (1958), we hold that the giving of Instruction No. 8 was prejudicial error.

## II

Appellant contends that the trial court erred in failing to instruct the jury on the doctrine of res ipsa loquitur.

■ The doctrine of res ipsa loquitur is defined as follows:

[W]henever a thing which has caused an injury is shown to have been under the control and management of the defendant charged with negligence, and the occurrence is such as in the ordinary course of events does not happen if due care has been exercised, the fact of the accident

itself is deemed to afford sufficient evidence to support a recovery in the absence of any explanation by the defendant tending to show that the injury was not due to his want of care.

*Barger v. Chelpon*, 60 S.D. 66, 70, 243 N.W. 97, 98 (1932) (citation omitted). See *Hansen v. Isaak*, supra. The doctrine should be invoked sparingly and only when facts and demands of justice make its application essential. *Shipley v. City of Spearfish*, 89 S.D. 559, 235 N.W.2d 911 (1975); *Barger v. Chelpon*, supra.

In determining whether res ipsa loquitur applies to this case, we must answer the following questions: 1) whether the jury could find as a fact that decedent's cause of death was electrocution,[1] and if so, 2) whether the other essential elements were present to warrant application of res ipsa loquitur. We conclude that the doctrine of res ipsa loquitur applies to this case.

A review of the record indicates that prior to his death, decedent was in good health. Decedent's physical condition was termed normal by a doctor who had examined him less than a month before his death. The physical examination disclosed nothing unusual. Although the two pathologists were unable to state the cause of death, they could not rule out electrocution.

The key testimony was that of John DeJean, who was only a short distance from decedent, and who testified that he felt electricity in the water. DeJean's credibility is bolstered by the testimony of others present at the scene, who testified that DeJean, at that time and without hesitating, referred to electricity in the water.

▌ We recognize that the two pathologists did testify on other possible causes of death. These other possibilities included vomiting and aspiration, "sudden death" syndrome, and death by an unknown cause.

Nevertheless, a jury can accept an inference of cause of death based on credible evidence even though inferences of other causes of death are reasonable. *Ruff v. Burger*, 32 Wis.2d 141, 145 N.W.2d 73 (1966). Here, DeJean's testimony provided the credible evidence to support electrocution as the cause of death. The jury might have found that decedent was electrocuted.[2] Therefore, the doctrine of res ipsa loquitur was available if the essential elements were present. *Shipley v. City of Spearfish*, supra; *Hansen v. Isaak*, supra; *Barger v. Chelpon*, supra; *Duncan v. Ft. Dodge Gas & Electric Co.*, 193 Iowa 1127, 188 N.W. 865 (1922); *Cain v. Southern Massachusetts Telephone Co.*, 219 Mass. 504, 107 N.E. 380 (1914). See also *Arkansas Light and Power Co. v. Jackson*, 166 Ark. 633, 267 S.W. 359 (1924); *Bond v. City of Champaign*, 128 Ill.App.2d 316, 261 N.E.2d 741 (1970).

▌ We must now decide whether the essential elements were present, thus warranting application of the doctrine of res ipsa loquitur. "It is the province of the court in the first instance to determine whether or not the circumstances are such as will, unexplained, permit the jury to draw the inference of negligence." *Barger v. Chelpon*, supra, 60 S.D. at 70, 243 N.W. at 98 (citation omitted). Our only determination is whether the res ipsa instruction should have been given, because the doctrine is primarily a rule of evidence. *Roster v. Inter-State Power Co.*, 58 S.D. 521, 237 N.W. 738 (1931); W. Prosser, Law of Torts § 40 (4th ed. 1971). Here, the facts of decedent's death allow the inference of negligence. The jury is not, however, compelled to make such an inference. *Sweeney v. Erving*, 228 U.S. 233, 33 S.Ct. 416, 57 L.Ed. 815 (1913); *Midwest Oil Co. v. City of Aberdeen*, 69 S.D. 343, 10 N.W.2d 701 (1943); *Barger v. Chelpon*, supra; W. Prosser, Law of Torts § 40 (4th ed. 1971).

---

1. During oral argument, counsel for appellant stated that certain findings of fact by the jury would be necessary before the inference afforded by the doctrine of res ipsa loquitur could arise.

2. In so holding, we reject appellee's contention by way of a petition for review that appellant did not produce sufficient evidence for the case to go to the jury. There were questions of fact for the jury in that certain facts were in dispute or at least different conclusions could be fairly drawn therefrom. *Schmeling v. Jorgensen*, 77 S.D. 8, 84 N.W.2d 558 (1957).

The three essential elements that must be present to warrant application of the doctrine of res ipsa loquitur are that:

the instrumentality which caused an injury must have been under the full management and control of the defendant or his servants; that the accident was such that according to common knowledge and experience does not happen if those having management or control had not been negligent; and that plaintiff's injury must have resulted from the accident.

Kramer v. Sioux Transit, Inc., 85 S.D. 232, 239, 180 N.W.2d 468, 472 (1970) (citations omitted).

The first essential element, full management and control, is present. The pump was owned, operated and maintained by appellee. Appellee cites *Shipley v. City of Spearfish*, supra, for the proposition that the pump was not in his exclusive control. We find *Shipley* inapposite here. We do not think that the system was removed from appellee's exclusive control just because boaters, water skiers and swimmers have ready access to the area of appellee's dock. Instead, appellee had a duty to maintain the pump in safe working condition. Appellee cannot place a potentially dangerous instrumentality in a public area and then avoid liability by claiming that it is not in his exclusive control because the area is readily accessible to other people.

Considering the evidence and their common knowledge and experience, the jury could have found that the second element was present here. A person is not normally electrocuted by an electrical pump while swimming in a river unless there is some negligence on the part of the person who has the pump in his exclusive control. Likewise, the jury could have found that the third element was present, because if decedent was electrocuted, his death must have resulted from electricity from the pump, which apparently was the only source of electricity in the area of appellee's dock. Cf. *Bergeler v. Waukesha Gas & Electric Co.*, 165 Wis. 68, 160 N.W. 1076 (1917).

3. This Court previously adopted the Restatement of Torts § 520 (1938) position on ultra-

We conclude that appellant did not waive the right to an instruction on res ipsa loquitur by trying to prove specific negligence. The res ipsa loquitur rule is "founded on an absence of specific proof of facts or omissions constituting negligence . . . ." *Barger v. Chelpon*, supra, 60 S.D. at 73, 243 N.W. at 100. We hold, as do most courts, that:

[W]here the circumstances of the occurrence and the pleadings of the parties would otherwise present a proper situation for the application of the doctrine, the plaintiff does not lose its benefits by introducing some evidence of specific negligence which does not establish clearly and definitely the precise cause of the injury . . . .

Annot., 33 A.L.R.2d 791, 795 (1954); see W. Prosser, Law of Torts § 40 (4th ed. 1971).

Accordingly, on retrial, an instruction on res ipsa loquitur should be given.

### III

Appellant's final contention is that the trial court erred in failing to instruct the jury on the doctrine of abnormally dangerous and ultrahazardous activity. The Restatement (Second) of Torts § 520 (1977) provides as follows:

In determining whether an activity is abnormally dangerous, the following factors are to be considered:

(a) existence of a high degree of risk of some harm to the person, land or chattels of others;

(b) likelihood that the harm that results from it will be great;

(c) inability to eliminate the risk by the exercise of reasonable care;

(d) extent to which the activity is not a matter of common usage;

(e) inappropriateness of the activity to the place where it is carried on; and

(f) extent to which its value to the community is outweighed by its dangerous attributes.[3]

hazardous activity in *Midwest Oil Co. v. City of Aberdeen*, supra.

"Whether the activity is an abnormally dangerous one is to be determined by the court, upon consideration of all the factors listed ... and the weight given to each that it merits upon the facts in evidence." Restatement (Second) of Torts § 520, comment 1 at 42 (1977).

We conclude that appellee's pump did not constitute an abnormally dangerous activity. First, it was possible to eliminate the risk by the exercise of reasonable care. "Most ordinary activities can be made entirely safe by the taking of all reasonable precautions; and when safety cannot be attained by the exercise of due care there is reason to regard the danger as an abnormal one." Restatement (Second) of Torts § 520, comment h at 38 (1977). Second, the use of a properly designed and installed pump is apparently an activity of common usage since testimony indicated that similar electrical pumps are in use up and down the Missouri River. Third, it is not inappropriate to place properly designed and installed electrical pumps in a river to provide water for irrigation and other uses. Accordingly, the use of an electrically operated pump by a landowner for ordinary purposes does not make that activity an abnormally dangerous activity.

The judgment is reversed and the case remanded to the circuit court for a new trial.

All the Justices concur.

BRADSHAW, Circuit Judge, sitting for MORGAN, J., disqualified.