#26062-a-JKK

**2012 S.D. 43**

IN THE SUPREME COURT
OF THE
STATE OF SOUTH DAKOTA

\* \* \* \*

MARGUERITE CASHMAN,                    Plaintiff and Appellant,

    v.

DARRICK VAN DYKE,                    Defendant and Appellee.


\* \* \* \*

APPEAL FROM THE CIRCUIT COURT OF
THE THIRD JUDICIAL CIRCUIT
JERAULD COUNTY, SOUTH DAKOTA

\* \* \* \*

THE HONORABLE JON R. ERICKSON
Judge

\* \* \* \*

CASEY N. BRIDGMAN
Wessington Springs, South Dakota    Attorney for plaintiff and
appellant.


RICHARD L. TRAVIS
LINDSAY K. EDWARDS of
May & Johnson, PC
Sioux Falls, South Dakota    Attorneys for defendant and
appellee.


\* \* \* \*

ARGUED FEBRUARY 14, 2012

OPINION FILED **05/30/12**

#26062

KONENKAMP, Justice

[¶1.]          Sometime after he lit his pilot light, Darrick Van Dyke's home burned down from a propane explosion. The fire spread, destroying Marguerite Cashman's home next door. Cashman brought suit against Van Dyke, alleging negligence, strict liability, and res ipsa loquitur. On Van Dyke's motion for summary judgment, the circuit court ruled that Cashman failed to present any evidence that Van Dyke acted negligently, that lighting a pilot light was an abnormally dangerous activity, or that the doctrine of res ipsa loquitur applied. Cashman appeals.

## Background

[¶2.]          Van Dyke's home caught fire during the early morning hours of October 12, 2007, following a propane explosion. The fire destroyed his home as well as Cashman's neighboring home. Van Dyke recounted that the night before the fire he came home from work around 9:00 p.m. He felt cold and "went downstairs and lit the furnace." He smelled no odor and noticed nothing unusual. The furnace started in its usual manner. He went to bed around 11:00 p.m. At 5:30 a.m., he awoke to what sounded like a tree falling on the house. His home was on fire. Although he was able to escape, the fire seriously injured him.

[¶3.]          Jerry VanDeOever was the first person on the scene and approached Van Dyke, who was sitting in the street. VanDeOever asked Van Dyke what happened. Van Dyke responded that "it blew up." He said, "I should have waited to have Schultz come and take a look at it." Schultz is a serviceman for the local gas supplier who had previously lit Van Dyke's pilot light and serviced his furnace. VanDeOever drove the badly burned Van Dyke to the hospital. There, VanDeOever

told Van Dyke's father, Jan, what happened.  Jan replied, "I told Darrick not to light that thing until he had talked to Schultz.  I told him that."  VanDeOever heard Jan ask Van Dyke why he did not wait until the next day to have Schultz come and look at it.  Van Dyke responded that he had gotten cold.  Van Dyke's injuries were so severe that he was airlifted to Sioux Falls for treatment.  Later, Jan went to Van Dyke's home and spoke with Shane Mentzer, the fire chief for the Wessington Springs Volunteer Fire Department.  Jan told Mentzer that he had warned Van Dyke not to light the furnace but to wait for Schultz, and that Van Dyke did not listen.

[¶4.]       In June 2008, Van Dyke brought suit against CHS, Inc., the propane supplier.  The case ended in a confidential settlement agreement.  Cashman brought suit against Van Dyke in 2009 asserting negligence, strict liability, and res ipsa loquitur.  Van Dyke moved for summary judgment.  In response, Cashman argued that material issues of fact were in dispute because (1) Van Dyke said that "it blew up" and that he should have waited for Schultz to light the pilot, (2) Van Dyke's father asked Van Dyke at the hospital why he did not wait for Schultz to light the pilot, (3) Van Dyke's father told third persons that Van Dyke should have waited for Schultz to light the pilot, and (4) Van Dyke's father had warned Van Dyke to wait.  From these facts, Cashman argued that a jury could infer that Van Dyke knew he should not have lit the pilot light himself, and because he did not wait for the serviceman, Van Dyke was negligent in lighting the pilot light or manipulating the furnace.  Van Dyke countered that even if Cashman's allegations were true, Cashman failed to present evidence that Van Dyke negligently lit the

pilot light, departed from the standard of care required for lighting a pilot light, or that lighting a pilot light is an abnormally dangerous activity.

[¶5.]     After a hearing, the circuit court issued a memorandum decision and order granting Van Dyke summary judgment. The court ruled that Van Dyke's "utterances made after the explosion are not proof that Van Dyke did something a reasonable person would not do, or failed to do something which a reasonable person would have done." The court further concluded that there was no case for strict liability, as lighting a home furnace is not an abnormally dangerous activity. Finally, the court held the doctrine of res ipsa loquitur inapplicable.

### Analysis and Decision

[¶6.]     Summary judgment is proper if the moving party shows there are no genuine issues of material fact in dispute. *Paradigm Hotel Mortg. Fund v. Sioux Falls Hotel Co., Inc.*, 511 N.W.2d 567, 569 (S.D. 1994). While the facts must be viewed in a light most favorable to the nonmoving party, "[w]hen a motion for summary judgment is made and supported as provided in § 15-6-56, an adverse party may not rest upon the mere allegation or denials of his pleading, but his response, by affidavits or as otherwise provided in § 15-6-56, must set forth specific facts showing that there is a genuine issue for trial." SDCL 15-6-56(e). "Unsupported conclusions and speculative statements do not raise a genuine issue of fact." *Paradigm*, 511 N.W.2d at 569 (citing *Home Fed. Sav. & Loan v. First Nat'l Bank*, 405 N.W.2d 655 (S.D. 1987)).

[¶7.]     On appeal, Cashman first argues that there are material issues of fact in dispute on whether Van Dyke negligently lit the pilot light or otherwise

manipulated the furnace. She insists that a jury could infer, contrary to Van Dyke's testimony, that he actually lit the pilot light at 5:30 a.m., right before the explosion. After he drove Van Dyke to the hospital, VanDeOever saw that Van Dyke's feet were bleeding profusely, and the nurses "started getting towels and water, and containers to put his feet in, containers to put his hands in just to help kind of cool them down. . . ." From this, Cashman deduces "that these burns were caused when Darrick Van Dyke lit the pilot light with his hands and he is leaning in with his right shoulder because he is right handed." Van Dyke's statements that "it blew up" and he should have waited for Schultz (the serviceman) to light the pilot support Cashman's opinion that an inference can be made that Van Dyke knew he should not have lit the pilot and was negligent when he failed to wait for Schultz.

[¶8.] Van Dyke testified to lighting the pilot light at 9:05 p.m., not at 5:30 a.m. Cashman wants an inference that Van Dyke lit the pilot at 5:30 a.m., but this amounts to nothing more than speculation. *See Paradigm*, 511 N.W.2d at 569. Regardless, even if we accept Cashman's speculation as true, there remains insufficient evidence of negligence to survive summary judgment.

[¶9.] Cashman argues that there is no question on how this fire started — it started by an explosion — and therefore, a question of fact remains on how Van Dyke was negligent. Indeed, there was an explosion, but an explosion alone does not mean Van Dyke did something negligently. Negligence is the "want of ordinary care[.]" SDCL 20-9-1. Cashman must present evidence that Van Dyke failed to do something a reasonable person would do in lighting the pilot light, or that lighting the pilot light was not something a reasonable person would do. *See Sommervold v.*

*Grevlos*, 518 N.W.2d 733, 742 (S.D. 1994). Both Van Dyke and his father wished Van Dyke would have waited for a serviceman to light the pilot. But what is missing is evidence that Van Dyke did something negligently. Without such evidence, we see no error in granting summary judgment on the negligence claim.

[¶10.]     Cashman next argues that strict liability applies. She claims that "[l]ighting a pilot in the middle of the night or in the early morning hours after the pilot light has gone out when gas may have been allowed to pool is inherently and abnormally dangerous." Strict liability would relieve Cashman of her burden of proving negligence. Thus, she asserts that Van Dyke recognized the inherent danger of lighting the pilot, was warned of the danger by his father, had previously called a serviceman to light his pilot, and decided nonetheless "to participate in this abnormally dangerous activity." Cashman cites no authority supporting her theory that lighting a home furnace pilot light is an abnormally dangerous activity.

[¶11.]     In *Fleege v. Cimpl*, we quoted the Restatement (Second) of Torts § 520 (1977) for the factors to be considered in determining whether an activity is abnormally dangerous. 305 N.W.2d 409, 414 (S.D. 1981). The factors are:

> (a) existence of a high degree of risk of some harm to the person, land or chattels of others;
>
> (b) likelihood that the harm that results from it will be great;
>
> (c) inability to eliminate the risk by the exercise of reasonable care;
>
> (d) extent to which the activity is not a matter of common usage;
>
> (e) inappropriateness of the activity to the place where it is carried on; and
>
> (f) extent to which its value to the community is outweighed by its dangerous attributes.

*Id.* Whether an activity is abnormally dangerous is to be decided by a court upon consideration of these factors. *Id.* at 415.

[¶12.] From our review of the factors and evidence Cashman presented, we cannot say that Van Dyke participated in an abnormally dangerous activity when he lit his pilot light. There is no evidence that lighting a home furnace pilot light carries a high degree of risk, that it is likely to result in great harm, that the degree of risk cannot be eliminated by exercising reasonable care, that lighting a pilot light is not a matter of common occurrence, that such lighting is an inappropriate activity in the place it is carried on, or that the value of lighting a pilot light by a homeowner is outweighed by its dangerous attributes. "Most ordinary activities can be made entirely safe by the taking of all reasonable precautions; and when safety cannot be attained by the exercise of due care there is reason to regard the danger as an abnormal one." *Id.* (quoting Restatement (Second) of Torts § 520, cmt. h (1977)). There being no evidence that lighting the pilot light in this case was abnormally dangerous, the court did not err when it granted Van Dyke summary judgment on this claim.

[¶13.] Lastly, Cashman asserts that Van Dyke's negligence can be inferred under the doctrine of res ipsa loquitur. According to Cashman, "houses just do not explode, according to our common knowledge and experience, unless those having the management and control [were] negligent." She again insists that "the explosion was caused by Van Dyke lighting or manipulating the pilot, something he knew he should not do."

[¶14.] Res ipsa loquitur allows a jury to infer negligence "whenever a thing which has caused an injury is shown to have been under the control and management of the defendant charged with negligence, and the occurrence is such as in the ordinary course of events does not happen if due care has been exercised[.]" *Barger v. Chelpon*, 60 S.D. 66, 70, 243 N.W. 97, 98 (1932) (citation omitted). In such cases, "the fact of the accident itself is deemed to afford sufficient evidence to support a recovery in the absence of any explanation by the defendant tending to show that the injury was not due to his want of care." *Id.* Whether the doctrine should be invoked must be decided by a court, keeping in mind that the doctrine is to be used "sparingly and only when the facts and demands of justice make the application essential." *Id.* at 100.

[¶15.] The mere occurrence of an explosion is insufficient to support the inference that Van Dyke was negligent. While we can agree that houses do not normally explode, we find no support for Cashman's argument that houses only explode if the owner or person in control of the home is negligent. To employ res ipsa loquitur here would require us to declare that the only explanation for the explosion in Van Dyke's home is negligence. From the evidence in the record, we do not know what triggered the explosion. Any number of reasons might explain it. Thus, res ipsa loquitur is inapplicable. The court did not err in granting Van Dyke summary judgment.

[¶16.] Affirmed.

[¶17.] GILBERTSON, Chief Justice, and ZINTER, SEVERSON, and WILBUR, Justices, concur.

-7-