#29496-aff in pt & rev in pt-SRJ
**2021 S.D. 55**

IN THE SUPREME COURT
OF THE
STATE OF SOUTH DAKOTA

* * * *

TALYN SHEARD, a/k/a TALYN
O'CONNER, as Personal Representative
for the Estate of Chalan Hedman,                    Plaintiff and Appellant,

    and

JEFFREY PAUL HOLSHOUSER,                    Plaintiff,

    v.

ROBERT HATTUM, BEVERLY HATTUM,
TODD HATTUM and CHELSEA HATTUM,
jointly and severally, DBA HATTUM
FAMILY FARMS,                    Defendants and Appellees.

* * * *

APPEAL FROM THE CIRCUIT COURT OF
THE SIXTH JUDICIAL CIRCUIT
HUGHES COUNTY, SOUTH DAKOTA

* * * *

THE HONORABLE MARGO D. NORTHRUP
Judge

* * * *

BRAD A. SCHRIEBER
Pierre, South Dakota                    Attorney for plaintiff and
    appellant.


GARY D. JENSEN
BRETT A. POPPEN of
Beardsley, Jensen & Lee, Prof. LLC
Rapid City, South Dakota                    Attorneys for defendants and
    appellees.

* * * *

ARGUED
MAY 24, 2021
OPINION FILED **09/22/21**

#29496

JENSEN, Chief Justice

[¶1.]	Chalan Hedman and Troy Hattum lost their lives after an explosion

and fire at the Hattum Family Farms.  Chalan's estate (the Estate) brought a

wrongful death suit against the Hattum Family Farms and individual members of

the Hattum family, seeking damages on strict liability and negligence theories.  The

circuit court granted the defendants' motion for summary judgment and dismissed

the Estate's claims.  We affirm in part and reverse in part.

**Facts and Procedural History**

[¶2.]	At the time of the accident, Hattum Family Farms was owned and

operated by Robert (Bob) Hattum and Beverly Hattum, their son Todd Hattum, and

Todd's wife Chelsea Hattum (the Hattums).[1]  Troy was Todd and Chelsea's son.

Troy was 22 years old, and Chalan was 23.  Both men had worked full-time for the

Hattums for several years and were good friends.  Chalan had lived in Todd and

Chelsea's home for a time and was engaged to be married to their daughter, Taylor

Hattum.  Chalan had a minor child, Z.O., from a prior relationship.

[¶3.]	The accident occurred on the morning of August 8, 2016, when Troy

and Chalan attempted to weld a half-inch split in a diesel fuel tank they had taken

off a Peterbilt truck that the Hattums owned.  The tank had leaked since the year

before when Chalan used the truck to haul silage.  Chalan used a bar of soap to plug

the split, but it only stopped the leak for about 30 minutes.  The Peterbilt truck had

---

1.	Beverly Hattum passed away in 2017, but she was initially named as a
	defendant when the action commenced in 2018.  Later, the circuit court
	granted the Hattums' uncontested motion to dismiss Beverly from the
	lawsuit.  While this appeal was pending, Bob passed away.

-1-

air conditioning, but as silage season approached, Bob told Chalan to haul silage with another truck that did not have air conditioning. On the morning of the accident, Chalan's fiancé, Taylor, testified that Chalan told her he would not drive a truck without air conditioning.

[¶4.] Jeff Holshouser was the only surviving witness to the accident. He worked full-time for the Hattums in the 1980s and considered Bob a friend. For the last several years, he had worked seasonally for the Hattums. When Jeff arrived at work on August 8, 2016, he saw the Peterbilt truck was pulled up to the front of the shop at the Hattum farm. Troy and Chalan were the only other people in the shop that morning. Todd was in Pierre buying equipment, and Bob was working ten miles away. Troy told Jeff that he was going to weld the split in the tank.

[¶5.] Jeff began to help Chalan take the mounts off the tank. The tank held about 75 to 100 gallons of diesel fuel, and there was about a gallon or so left in the tank. The men dumped that out, then all three men ran about 50 gallons of water from a nearby fire hydrant through the tank and "sloshed" it around. They rinsed the tank out two or three times for about 20 minutes in this manner. Then they used an air compressor to dry it out. Once the tank had been rinsed and the men identified the split, Troy and Chalan used a grinder to shine it. Meanwhile, Jeff walked over to the shop bench about 20 feet away and began to organize the tank's mounting brackets.

[¶6.] Troy or Chalan, although Jeff was "pretty sure" it was Troy, drove an ATV up to the shop and parked it under the overhead door. Troy and Chalan left the ATV running, then hooked a hose up to the exhaust of the ATV and placed the

other end in the filler hole of the diesel tank, so that exhaust from the ATV ran into the tank cavity. Jeff became concerned because he had never seen anything being welded this way and asked Troy what he was doing. Troy assured Jeff that this was the "textbook way" to do the job. Troy also showed him a spot on the tank where Troy claimed to have welded the tank a year earlier. Based on Troy's assurances, Jeff walked back to the shop bench and resumed organizing the mounting brackets.

[¶7.] There was a strong wind blowing through the shop doors that morning. Chalan closed the walk-through door of the shop and lowered the overhead door so it rested on the seat of the ATV. Chalan also grabbed a large piece of cardboard to use as a windbreaker. He stood next to Troy and held the cardboard while Troy began to weld the tank.

[¶8.] Within a minute or so, there was an explosion. It blew Jeff forward onto the shop bench. Jeff turned to look toward Chalan and Troy and saw that the entire front area of the shop where they had been standing was "totally engulfed in flames – floor to ceiling." Jeff could not see either man through the flames, but he heard them screaming. Chalan seemed to be outside the shop while Troy was screaming from inside.

[¶9.] Jeff rushed to the back of the shop where he believed there was a fire extinguisher but could not find it. He turned back and saw Troy moving towards the center of the shop, still engulfed in flames. Jeff yelled "drop and roll," and Troy did. Jeff dove on top on him and rolled with him, but he quickly realized the floor they were rolling on was also on fire and his clothes were burning.

[¶10.]     Jeff jumped up and peeled off his shirt and jacket and used them to try to beat the flames off his pants. He could hear gas hissing from an oxygen tank in the shop and recognized they did not have much time to flee. Jeff grabbed Troy's hand to lead him out, but Troy pulled his hand away as if he was in pain. Jeff opened the walking door to the shop to exit, and Troy followed. Jeff believed another tank in the shop exploded at that time, and he lost sight of Troy.

[¶11.]     Jeff ran to retrieve a fire extinguisher. He saw Troy walking out of the shop as he ran back. Jeff extinguished some of the remaining flames on Troy and guided him toward the front of Todd's house where there was a swimming pool. Jeff saw that Troy's siblings had exited the house by this point and Chalan was with them. Jeff surmised that Chalan must have gotten out of the shop through the overhead door and jumped into the pool.

[¶12.]     An ambulance arrived to take the three men to the hospital. Jeff's face, arms, hands, ears, and upper body were burned. Troy and Chalan suffered more severe burns. Both men died in the hospital within two weeks of the accident.

[¶13.]     Talyn Sheard, the biological mother of Z.O. and the personal representative of the Estate, filed a complaint against the Hattums on July 5, 2018. The complaint alleged claims for strict liability and negligence and sought compensatory and punitive damages. On December 4, 2018, Jeff filed a separate complaint against the Hattums for his injuries. After the parties began discovery, the circuit court granted the Hattums' motion to consolidate the lawsuits.

[¶14.]     Bob and Todd were self-trained welders, as was Troy. During his deposition, Bob stated Troy was an excellent welder, and he and Todd taught Troy

how to weld. Bob further explained that his father, a professional welder, taught him to weld fuel tanks in the "same manner" Troy applied. However, Bob claimed he had not welded any fuel tanks on the farm in the last 40 years. Bob was not asked if he taught Troy how to weld fuel tanks. Bob, Todd, and Chelsea submitted affidavits stating they never instructed Troy or Chalan to weld the split in the tank, they had no knowledge of a plan to weld the tank, and they were unaware that any fuel tank had been welded on the farm in the last 40 years.

[¶15.]      Further, Bob testified that he planned to replace the leaky tank as he had with other defective equipment. However, it is unclear whether a new tank was ever ordered. Bob and Todd also testified that, a couple of days before the accident, they told Troy and Chalan "to leave the truck alone." Todd further explained that repairing the fuel tank was not a priority because he was focused on preparing the silage cutter and they had another truck they could use. Bob stated he believed welding the tank could be dangerous. There is no evidence Bob told Troy and Chalan his concerns, but Bob stated welding the tank "wouldn't have been allowed" had he known about it.

[¶16.]      Bob, Todd, and Chelsea testified that Troy had no supervisory authority over other employees on the farm, and they had never told anyone Troy had such authority. Bob stated the chain of command was him, Todd, and then their foreman Ben Reinert, who had worked at the farm for ten years. He stated that his grandchildren did as they were told. Troy and Chalan often worked together, but Bob claimed neither had authority over the other. The Hattums also submitted an affidavit from Chalan's father, Steve Hedman, stating that Chalan

had observed him welding fuel tanks while exhaust from another vehicle was pumped into the tanks.

[¶17.] After discovery, the Hattums filed a motion for summary judgment on both complaints. Jeff submitted an affidavit in response to the motion, in which he disputed Bob and Todd's testimony that Troy lacked supervisory authority at the farm. Jeff stated:

> It was made clear to employees that if Bob or Todd were not present, that Troy . . . was the charge-next in line . . . . There are not statements that "Troy is your boss," it is rather every occurrences that the Hattum family owners, Bob and Todd, give authority to their son, or grandson . . . to run the hired hands and keep the place running. . . . Troy gave me instructions in the presence of Bob and/or Todd and I followed them . . . .

Jeff claimed that sometimes the Hattums told him to go find Troy and ask Troy for work. Jeff stated that Chalan had a similar relationship with Troy, and Bob and Todd "did not in any manner suggest that Troy did not have authority to give instructions."

[¶18.] In their summary judgment motion, the Hattums did not raise the question of whether welding a diesel fuel tank was an abnormally dangerous activity. Instead, they argued they could not be held strictly liable, as a matter of law, because none of them were present when the welding occurred, and they had specifically instructed Troy and Chalan to leave the truck alone. They also argued the Estate's and Jeff's unsafe workplace claims failed because there was no evidence of negligence. Additionally, the Hattums argued that the fellow servant rule barred any liability for claims of negligence or strict liability arising from Troy's actions. *See* SDCL 60-2-2 (stating the fellow servant rule). Alternatively, the Hattums

claimed that Chalan and Jeff assumed the risk of any injuries and were contributorily negligent. The Hattums also moved for summary judgment on the Estate's claim for punitive damages.

[¶19.] The Estate and Jeff claimed fact questions existed concerning their unsafe workplace and strict liability claims. They conceded that they could not offer any evidence disputing Bob and Todd's testimony that Troy and Chalan were instructed to "leave the truck alone." However, the Estate and Jeff argued a factfinder could infer this statement was untrue. For instance, they argued that a jury could find this testimony was not credible because there was no evidence Troy and Chalan had disobeyed orders before or that the Hattums had ordered a replacement tank. Further, the Estate and Jeff argued that assumption of the risk is not a defense to strict liability, and in any event, questions of fact existed on whether Chalan and Jeff had assumed the risk.

[¶20.] The court granted the Hattums' motion for summary judgment on the Estate's claims. The court assumed for summary judgment purposes that welding the diesel fuel tank was an abnormally dangerous activity. However, the court held Chalan knew Troy was not acting in a supervisory capacity at the time of the explosion because the Hattums instructed Troy and Chalan to leave the truck alone. Therefore, the court determined the fellow servant rule barred the Estate from recovery on its strict liability claim. The court also held the Estate's unsafe workplace claim failed because it was not foreseeable to the Hattums that Troy and Chalan would weld the fuel tank, the Hattums could not be held liable for obvious dangers, and Chalan had assumed the risk as a matter of law. Additionally, the

court determined there were no facts in the record to support the Estate's claim for punitive damages.[2]

[¶21.] The Estate appeals and raises two issues for review: (1) whether the circuit court erred by granting summary judgment on the unsafe workplace claim and (2) whether the circuit court erred by granting summary judgment on the strict liability claim.[3]

## Analysis and Decision

[¶22.] "We review a grant or denial of summary judgment de novo." *Hamen v. Hamlin Cnty.*, 2021 S.D. 7, ¶ 15, 955 N.W.2d 336, 343. "Summary judgment is proper where the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Hanson v. Big Stone Therapies, Inc.*, 2018 S.D. 60, ¶ 23, 916 N.W.2d 151, 158. "The evidence must be viewed most favorably to the nonmoving party and reasonable doubts should be resolved against the moving party. The nonmoving party, however, must present specific facts showing that a genuine, material issue for trial exists." *Saathoff v. Kuhlman*, 2009 S.D. 17, ¶ 11, 763 N.W.2d 800, 804.

---

2. The court also granted the Hattums' motion for summary judgment on Jeff's unsafe workplace claim. However, because there was no evidence that the Hattums instructed Jeff to leave the truck alone, the court initially determined questions of fact existed on Jeff's strict liability claim. The Hattums responded by filing a second motion for summary judgment on Jeff's strict liability claim. On reconsideration, the court determined that Jeff had assumed the risk for his injuries as a matter of law and granted the motion. Jeff has not appealed the circuit court's decision.

3. At oral argument, the Estate conceded the issue of punitive damages, stating it did not believe the record supported this claim.

> ### 1. Whether the circuit court erred by granting summary judgment on the Estate's unsafe workplace claim.

[¶23.] Negligence requires proof of "(1) a duty on the part of the defendant; (2) a failure to perform that duty; and (3) an injury to the plaintiff resulting from such a failure." *Kirlin v. Halverson*, 2008 S.D. 107, ¶ 28, 758 N.W.2d 436, 448 (citation omitted). "The existence of a duty is a question of law that is reviewed de novo." *Id.* We have previously held "[e]mployers have a nondelegable duty to provide their employees with reasonably safe places to work."[4] *Stone v. Von Eye Farms*, 2007 S.D. 115, ¶ 9, 741 N.W.2d 767, 770. "Inherent to this duty is an obligation that employers provide employees with proper training and supervision." *Id.* Whether a party has breached a duty in tort is generally a question of fact. *Janis v. Nash Finch Co.*, 2010 S.D. 27, ¶ 22, 780 N.W.2d 497, 504.

[¶24.] The Estate argues the Hattums breached their duty to provide a safe workplace by failing to provide adequate training and supervision. Although not specifically alleged in their complaint, the Estate also argued, both to the circuit court and on appeal, that the Hattums are vicariously liable for Troy's negligent conduct. The Hattums respond that they had no duty to Chalan because it was not foreseeable that Troy, Chalan, and Jeff would weld the tank. They also claim that there is no evidence that they breached their duty to provide a safe work place, and the fellow servant rule precludes liability for any negligence on Troy's part.

---

4. Most of our cases discussing a negligence theory of liability for an unsafe workplace involve agricultural laborers because they are one of the few vocations that are statutorily exempted from the exclusive workers' compensation remedies provided for in most employer/employee relationships. *See* SDCL 62-3-15.

Further, they argue, as a matter of law, that Chalan knew of the risk involved in welding a fuel tank and voluntarily assumed that risk by assisting to prepare and weld the tank.

[¶25.]     In a negligence action, the "duty owed by the defendant to the plaintiff . . . requires the defendant to conform to a certain standard of conduct in order to protect the plaintiff against unreasonable risks . . . ." *Janis*, 2010 S.D. 27, ¶ 8, 780 N.W.2d at 500 (citation omitted). The plaintiff must present evidence that the employer breached its duty to provide adequate training or supervision to prove negligence in an unsafe workplace claim. *See Stone*, 2007 S.D. 115, ¶¶ 12–15, 741 N.W.2d at 770–71 (holding a court erred in granting a directed verdict for the defendant on an unsafe workplace claim involving a tractor accident when the plaintiff presented evidence that the employer "overwork[ed] . . . employees" and failed to provide training on "tasks to which he was assigned"); *Nelson v. Nelson Cattle Co.*, 513 N.W.2d 900, 903–04 (S.D. 1994) (affirming the denial of a defendant's motion for directed verdict when the plaintiff was injured moving a grain bin and presented evidence the employer "did not provide enough competent workers" or "safe tools to move the bin").

[¶26.]     Relying on Bob's testimony that he and Todd helped teach Troy to weld, the Estate argues there are fact questions on whether the Hattums breached their duty to properly train Troy. However, there was no evidence on the training Bob and Todd provided to Troy, or that such training was inadequate. There is also no evidence the Hattums instructed Troy or Chalan how to weld a fuel tank, or that they directed or even knew that Troy and Chalan would weld the tank. To the

contrary, the Hattums told Troy and Chalan to leave the truck alone. Moreover, the Estate has not alleged that the Hattums failed to provide proper welding and safety equipment in the shop area, or that such a failure contributed to Chalan's death.[5]

[¶27.]     Importantly, the Estate has also failed to present evidence on whether the fuel tank could have been welded safely, and if so, whether Troy welded the tank in a dangerous and inappropriate way. In fact, the record suggests that Troy may have used proper techniques: Bob testified Troy's method was similar to a method he used to weld a fuel tank many years earlier; Troy told Jeff he was applying the "textbook" welding method; and Chalan's father testified he had welded fuel tanks in a similar manner to the method Troy used. Thus, the Estate's unsafe workplace claim appears to rest solely on an inference that Troy was not adequately trained because there was an explosion and fire after he began welding. A bad outcome or evidence of a mistake is not, by itself, proof of negligence. *See Kostel v. Schwartz*, 2008 S.D. 85, ¶ 54, 756 N.W.2d 363, 381.

[¶28.]     Moreover, the adequacy of Troy's training, welding techniques, and specifically if and how a fuel tank can be welded safely, is not within the common knowledge or experience of a lay person. Yet the Estate did not offer any testimony or evidence on accepted welding techniques and safety standards. "[T]his Court has repeatedly affirmed that expert testimony is required when the subject matter at issue does not fall within the common experience and capability of a lay person to

---

5.     Jeff testified that he had trouble locating a working fire extinguisher after the explosion. However, the Estate did not allege or present any evidence that Chalan's injuries would have been lessened or prevented if Jeff had immediate access to a working fire extinguisher on the morning of the accident.

judge." *Matter of Drainage Permit 11-81*, 2019 S.D. 3, ¶ 42, 922 N.W.2d 263, 275 (internal quotation marks omitted). Without such evidence, the Estate has not generated a fact question on whether the Hattums breached their duty to train, or whether this breach caused the accident. "Entry of summary judgment is mandated against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Veblen Dist. v. Multi-Cmty. Co-op. Dairy*, 2012 S.D. 26, ¶ 7, 813 N.W.2d 161, 164 (citation omitted).[6]

[¶29.] The Estate also argues that the Hattums' absence from the shop on the morning of the accident is sufficient to create a fact question on whether they breached their duty to supervise their employees. However, we have never held that the duty to provide a safe workplace requires an employer to continuously monitor or supervise its employees. In absence of some evidence showing that the Hattums should have anticipated that Troy or Chalan would weld the diesel fuel tank or needed additional supervision on the morning of the accident, this argument fails.

---

6. Under the doctrine of res ipsa loquitur, a trier of fact may consider whether negligence occurred when there is a bad result, which "together with other facts and circumstances disclosed by the evidence in a given case," indicate that "such [a] result is attributable to negligence or want of skill." *Kostel*, 2008 S.D. 85, ¶ 54, 756 N.W.2d at 381. However, the Estate did not allege a negligence theory based on res ipsa loquitur, nor has the Estate offered any argument or authority suggesting that res ipsa loquitur provides a basis to support their claim that the Hattums breached their duty to train and supervise.

***Vicarious Liability***

[¶30.]      Under *respondeat superior*, an employer or principal may be held liable for an "employee's or agent's wrongful acts committed within the scope of the employment or agency." *Kirlin*, 2008 S.D. 107, ¶ 12, 758 N.W.2d at 444 (quoting *Black's Law Dictionary*, (8th ed. 2004)). "The employer's vicarious liability is a function of status and stems entirely from the tortious conduct of the [employee], not from any tortious conduct by the [employer.]" *Cameron v. Osler*, 2019 S.D. 34, ¶ 16, 930 N.W.2d 661, 666 (internal quotation marks omitted, alterations in original).

[¶31.]      As discussed above, there is no testimony, expert or otherwise, suggesting that Troy welded the tank in an improper or unsafe manner. Thus, jurors would have no evidence from which to consider whether the method Troy used to weld the tank was a breach of a duty of care and caused the explosion. Further, absent evidence of the risks inherent in such an activity, jurors would be forced to speculate on whether Troy's decision to weld the tank in such a manner was, itself, negligent. *See* Restatement (Second) of Torts § 520 cmt. b (1977) (distinguishing liability for negligence from strict liability for engaging in an abnormally dangerous activity). Because the Estate failed to present facts showing that Troy welded the tank in an improper or unsafe way, or that his decision to weld the tank posed an unreasonable risk, their negligence claim against the Hattums based on vicarious liability must also fail.[7] *See N. Star Mut. Ins. v. Korzan*, 2015

---

7.    The Hattums argue that even if Troy was negligent, the fellow servant rule, codified in SDCL 60-2-2, bars the Estate from recovery. The Estate responds that fact questions exist concerning whether Troy was acting in a supervisory role when the accident occurred, precluding application of the fellow servant

(continued . . .)

S.D. 97, ¶ 21, 873 N.W.2d 57, 63 ("Mere speculation and general assertions, without some concrete evidence, are not enough to avoid summary judgment.").

**2.     *Whether the circuit court erred by granting summary judgment on the Estate's strict liability claim.***

[¶32.]     "Strict liability is reserved for selected uncommon and extraordinarily dangerous activities for which negligence is an inadequate deterrent or remedy." *Grube v. Daun*, 570 N.W.2d 851, 857 (Wis. 1997). A party engaged in an abnormally dangerous activity has a duty to compensate a person injured by the activity. *See* Restatement (Second) of Torts § 519 (1977) ("One who carries on an abnormally dangerous activity is subject to liability for harm to the person, land or chattels of another resulting from the activity, although he has exercised the utmost care to prevent the harm."). Whether an activity is abnormally dangerous is a question of law for the court.[8] *See Cashman v. Van Dyke*, 2012 S.D. 43, ¶ 11, 815 N.W.2d 308, 312.

---

(. . . continued)
   rule as a matter of law. *See Smith v. Cmty. Co-op. Ass'n of Murdo*, 87 S.D. 440, 444, 209 N.W.2d 891, 893 (1973). It is unnecessary to resolve this issue given our determination that the Estate has failed to generate a genuine issue of material fact concerning their claim that Troy was negligent.

8.     We consider the following factors "in determining whether an activity is abnormally dangerous[:]
       (a) existence of a high degree of risk of some harm to the person, land or chattels of others;
       (b) likelihood that the harm that results from it will be great;
       (c) inability to eliminate the risk by the exercise of reasonable care;
       (d) extent to which the activity is not a matter of common usage;
       (e) inappropriateness of the activity to the place where it is carried on; and

                                                      (continued . . .)

[¶33.]     The Hattums did not move for summary judgment on the issue of whether welding a diesel fuel tank was an abnormally dangerous activity. Thus, the parties did not develop the record on this issue so that the circuit court could weigh the relevant factors and determine whether welding the diesel tank was unreasonably dangerous. Instead, the court assumed, without deciding, that the activity was abnormally dangerous for summary judgment purposes. On appeal, neither party argues that welding a diesel fuel tank is not an abnormally dangerous activity. Given the posture of the case, we are unable to resolve, and decline to consider, whether the welding a diesel fuel tank is an abnormally dangerous activity that gives rise to strict liability.[9]

_____

(. . . continued)

> (f) extent to which its value to the community is outweighed by its dangerous attributes."

*Cashman*, 2012 S.D. 43, ¶ 11, 815 N.W.2d at 312 (citation omitted).

9.    Some jurisdictions have held that welding, including the welding of a fuel tank, is not an abnormally dangerous activity. *See, e.g.*, *Valley Elec., Inc. v. Doughty*, 528 P.2d 927, 928 (Colo. App. 1974) ("We agree that welding with an oxygen-acetylene cutting torch presents some hazards because of the extreme heat generated by this device. However, we are not convinced that its use is an inherently dangerous activity which imposes liability upon the user without proof of negligence."); *Ne. Ill. Reg'l Commuter R.R. Corp. v. Kiewit W. Co.*, 396 F. Supp. 2d 913, 923 (N.D. Ill. 2005) ("While welding and torch cutting present some hazards, there is no evidence they are ultra hazardous activities in and of themselves . . . ."). The Alaska Supreme Court has held "the welding, buffing, or grinding of a petroleum tanker" was not ultrahazardous and subject to strict liability because, although it "necessarily involves a risk of serious harm, such risks can be eliminated by the exercise of utmost care by the parties involved. Neither is the activity not a matter of common usage." *Matomco Oil Co., Inc. v. Arctic Mech., Inc.*, 796 P.2d 1336, 1341–42 (Alaska 1990) (internal quotation marks omitted).

[¶34.]    There is no dispute that the Hattums were not involved in welding the tank and did not direct Troy and Chalan to weld the tank. However, the Estate alleges the Hattums may be held strictly liable under agency theories because Troy was acting in the scope of his employment when he directed Chalan and Jeff to help prepare the tank. The Hattums respond that vicarious liability is inapplicable because Troy was not acting in the scope of his employment. The Hattums also argue that the fellow servant rule bars the Estate from recovery, and Chalan assumed the risk as a matter of law.

***Scope of Employment***

[¶35.]    "The ancient doctrine of respondeat superior is well established as holding an employer or principal liable for the employee's or agent's wrongful acts committed within the scope of the employment or agency." *Iverson v. NPC Int'l, Inc.*, 2011 S.D. 40, ¶ 8, 801 N.W.2d 275, 278–79 (citation and internal quotation marks omitted). "[T]his Court [has] adopted a 'foreseeability' test to determine whether an agent's acts were within the scope of employment. . . ." *Kirlin*, 2008 S.D. 107, ¶ 13, 758 N.W.2d at 444 (citation omitted). A court considers several factors in "determin[ing] if a servant's act is within the scope of employment," and thus foreseeable. *Id.* ¶ 17, 758 N.W.2d at 445. *See also* Restatement (Second) of Agency § 229 (1958).[10] The "essential focus of inquiry" when determining if an

---

10.    The factors we consider include: 1) whether a "benefit ran to the principal," 2) whether the act "was remote in time from the principle's involvement with the victim[]," 3) whether the "opportunity to commit the act arose out of the agent's personal relationship with the victim[], outside of the agent's employment," and 4) whether "[i]mposing liability on employers in these

(continued . . .)

employee's actions were foreseeable and within the scope of their employment is whether the employee's acts were in furtherance of their employment. *Gruhlke v. Sioux Empire Fed. Credit Union, Inc.*, 2008 S.D. 89, ¶ 14, 756 N.W.2d 399, 407. "[T]he fact that the servant's act is expressly forbidden by the master, or is done in a manner which he has prohibited, is to be considered in determining what the servant has been hired to do, but it is usually not conclusive, and does not in itself prevent the act from being within the scope of employment." *Id.* (citation omitted). Whether an employee is acting within the scope of their employment is generally a question of fact. *Deuchar v. Foland Ranch, Inc.*, 410 N.W.2d 177, 181 (S.D. 1987).

[¶36.] The Hattums offered evidence that Bob and Todd instructed Chalan and Troy to leave the truck alone and instructed Chalan to use another truck to haul silage. However, the welding took place with the Hattums' equipment, during work hours, at the Hattums' farm, and may have been undertaken, in part, to repair the Hattums' truck for their benefit. On this record, we conclude there is a fact question on whether Troy was acting within the scope of his employment when he welded the diesel tank.

### Fellow Servant Rule

[¶37.] Nonetheless, the Hattums claim the circuit court properly applied the fellow servant rule to bar the Estate from recovery. The fellow servant rule is an exception to employer liability under respondeat superior and was codified in SDCL 60-2-2. It provides:

---

(. . . continued)
circumstances would be 'unfair.'" *Kirlin*, 2008 S.D. 107, ¶ 17, 758 N.W.2d at 445 (citation omitted).

> An employer, except as otherwise specially provided, is not bound to indemnify an employee *for losses suffered by the employee in consequence of the ordinary risks of the business in which employed, nor in consequence of the negligence of another person employed by the same employer in the same general business,* unless the employer has neglected to use ordinary care in the selection of the culpable employee.

SDCL 60-2-2 (emphasis added).

[¶38.]    "[I]f the words and phrases in the statute have plain meaning and effect, we should simply declare their meaning and not resort to statutory construction." *Reck v. S.D. Bd. of Pardons & Paroles*, 2019 S.D. 42, ¶ 11, 932 N.W.2d 135, 139.  SDCL 60-2-2 bars an employee from recovery for "losses suffered . . . in consequence of the ordinary risks of the business" and "in consequence of the negligence" of another employee.

[¶39.]    As previously discussed, we are unable to determine whether welding the diesel fuel tank was an abnormally dangerous activity, or an "ordinary" risk of Chalan's employment.  More importantly, the plain language limits the statutory bar for liability to acts that are a "consequence of the *negligence* of another person employed by the same employer . . . ."  SDCL 60-2-2 (emphasis added).  There is no language in the statute suggesting that the Legislature intended to bar strict liability claims by an employee against an employer when a co-employee, acting in the scope of employment, engages in an abnormally dangerous activity.  Since there is no evidence that Troy was negligent, and his negligence lead to Chalan's death, the statutory bar to employer liability in SDCL 60-2-2 is inapplicable.

***Assumption of the Risk***

[¶40.]     Finally, the Hattums argue that the Estate cannot recover because Chalan assumed the risk as a matter of law.  "A person assumes the risk of injury when the person: (1) has actual or constructive knowledge of the risk; (2) appreciates its character; and (3) voluntarily accepts the risk, with the time, knowledge, and experience to make an intelligent choice."  *Schott v. S.D. Wheat Growers Ass'n*, 2017 S.D. 91, ¶ 12, 906 N.W.2d 359, 362 (citation and internal quotation marks omitted).  Our cases generally treat assumption of risk as a question of fact.  *See Mack v. Kranz Farms, Inc.*, 1996 S.D. 63, ¶ 8, 548 N.W.2d 812, 814.

[¶41.]     Although we have not previously applied assumption of the risk as a defense to a strict liability claim involving an abnormally dangerous activity, we have recognized the doctrine as a complete defense to claims involving unreasonably dangerous products.  *See Wangsness v. Builders Cashway, Inc.*, 2010 S.D. 14, ¶ 13, 779 N.W.2d 136, 140 ("It is well established in South Dakota that assumption of the risk is a defense to a claim of strict products liability.").  We see no meaningful distinction to the application of assumption of the risk to a strict liability claim involving an unreasonably dangerous product and strict liability involving an abnormally dangerous activity.  Thus, we conclude that the Hattums may raise assumption of the risk as a defense to the Estate's strict liability claim for an abnormally dangerous activity.  Our conclusion is consistent with the Restatement (Second) of Torts § 523 (1977), which states, "[t]he plaintiff's

assumption of the risk of harm from an abnormally dangerous activity bars his recovery for the harm."

[¶42.]      In considering an assumption of the risk defense, the elements of "knowledge of the risk" and appreciation of its character require a "knowledge of the danger and intelligent acquiescence in it.  [A party] must not only know of the facts [that] create the danger, but they must comprehend and appreciate the danger itself." *Schott,* 2017 S.D. 91, ¶ 13, 906 N.W.2d at 362 (internal citation omitted). However, when an activity carries an obvious risk of danger, we have held an injured party may have had constructive knowledge of the risk. *See id.* ¶¶ 13–14, 906 N.W.2d at 362–63 ("[K]nowledge and appreciation-of-danger elements are not purely subjective questions in constructive-knowledge cases . . . .  There are some risks as to which no adult will be believed if he says that he did not know or understand them.").  "[C]onstructive knowledge [of risk] is confined to dangers so plainly observable that the plaintiff must be presumed to have had *actual knowledge*." *Jensen v. Menard, Inc.,* 2018 S.D. 11, ¶ 22, 907 N.W.2d 816, 823 (citation and internal quotation marks omitted).  "[T]he master cannot be held liable for failure to furnish a safe place to work if the danger is so obvious and is before the servant's eyes to such extent that he must know, by the use of ordinary intelligence, the danger that confronts him." *Jackson v. Van Buskirk,* 424 N.W.2d 148, 149 (S.D. 1988).  "Typical examples" of risks within every adult's constructive knowledge are that "one can burn from fire, drown in water, or fall from heights." *Schott,* 2017 S.D. 91, ¶ 14, 906 N.W.2d at 363.  *See, e.g., Goepfert v. Filler,* 1997 S.D.

56, ¶ 8, 563 N.W.2d 140, 143; *Mack*, 1996 S.D. 63, ¶¶ 11–13, 548 N.W.2d at 814;

*Myers v. Lennox Co-op. Ass'n*, 307 N.W.2d 863, 864–65 (S.D. 1981).

[¶43.]     The average adult would certainly know and appreciate that there was

a risk of fire or explosion from applying a flame to a diesel fuel tank that had just

been emptied of diesel fuel.  However, the tank was then rinsed with water, dried,

and pumped with exhaust.  The degree of risk that existed after these precautions

were taken, as well as Chalan's knowledge and appreciation of that risk, is not

apparent on this record.  Further, there is evidence from which Chalan could have

believed the risk had been significantly reduced or eliminated.  Troy assured

Chalan and Jeff immediately before he began to weld that he was using the

"textbook method" to weld the tank.  Evidence was also presented that Chalan had

observed his father weld fuel tanks in the same manner as Troy.  Taking the

evidence in the light most favorable to the Estate, questions of fact exist as to

whether Chalan knew and appreciated the risk of welding the fuel tank.  *See Mack*,

1996 S.D. 63, ¶ 8, 548 N.W.2d at 814 ("It is only when the essential elements [of

assumption of the risk] are conclusively established that the plaintiff may be

charged with assum[ing] . . . the risk as a matter of law." (citation omitted)).

### Conclusion

[¶44.]     We affirm the circuit court's dismissal of the negligence claim against

the Hattums.  We reverse and remand the circuit court's dismissal of the strict

liability claim, concluding that genuine issues of material fact exist as to whether

Troy was acting in the scope of his employment when he welded the tank and

whether Chalan assumed the risk. We also leave open the legal question of whether welding a diesel fuel tank is an abnormally dangerous activity.

[¶45.]     KERN, SALTER, and MYREN, Justices, and MAGERA, Circuit Court Judge, concur.

[¶46.]     MAGERA, Circuit Court Judge, sitting for DEVANEY, Justice, disqualified.